IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

MARSHALL DIVISION

PICTIVA DISPLAYS )(
INTERNATIONAL LTD., AND KEY )(
PATENT INNOVATIONS LIMITED, )(
PLAINTIFFS, )( CIVIL ACTION NO.
)( 2:23-CV-495-JRG-RSP
VS. )( MARSHALL, TEXAS
)(
SAMSUNG ELECTRONICS CO., )(
LTD., AND SAMSUNG ELECTRONICS)(
AMERICA, INC., )( OCTOBER 31, 2025
DEFENDANTS. )( 8:01 A.M.

TRIAL TRANSCRIPT

BEFORE THE HONORABLE RODNEY GILSTRAP

UNITED STATES DISTRICT JUDGE

VOLUME 5

FOR THE PLAINTIFFS:

Mr. Jason G. Sheasby
Mr. Michael W. Tezyan
Irell & Manella LLP
1800 Avenue of the Stars
Suite 900
Los Angeles, CA 90067

Ms. Rebecca Carson
Irell & Manella LLP
840 Newport Center Driver
Suite 400
Newport Beach, CA 92660

Ms. Jennifer L. Truelove
McKool Smith, PC
104 East Houston Street
Suite 300
Marshall, TX 75670

FOR THE DEFENDANTS:

Mr. Sean S. Pak
Ms. Melissa J. Baily
Quinn Emanuel Urquhart & Sullivan
50 California Street
22nd Floor
San Francisco, CA 94111

Mr. Lance L. Yang
Mr. Patrick T. Schmidt
Quinn Emanuel Urquhart & Sullivan
865 S. Figueroa Street
10th Floor
Los Angeles, CA 90017

Mr. Gil Gillam
Gillam & Smith, LLP
303 South Washington Avenue
Marshall, TX 75670

COURT REPORTER:

Ms. Shelly Holmes, CSR, TCRR
Official Court Reporter
Honorable Robert W. Schroeder III
United States District Judge
Eastern District of Texas
Texarkana Division
500 North State Line Avenue
Texarkana, TX 75501
shelly_holmes@txed.uscourts.gov

(Proceedings recorded by mechanical stenography, transcript produced on a CAT system.)

(Jury out.)

COURT SECURITY OFFICER: All rise.

THE COURT: Be seated, please.

At this time, the Court will take up motions from either party that either party cares to offer pursuant to Rule 50(a) of the Federal Rules of Civil Procedure.

As I discussed with you yesterday evening, counsel, the approach I'd like to take is to have each side identify for me topically or by subject matter the issues they care to seek relief on pursuant to Rule 50(a). After you've identified the subject matter, then I'll be able to order the argument between the parties in the most efficient manner, given that there may well be diametrically opposed motions.

08:02:23

So with that, whoever is going to speak for Plaintiff, if you would go to the podium and identify for me the matters upon which you seek relief under Rule 50(a).

MR. TEZYAN: Thank you, Your Honor. Michael Tezyan for Plaintiffs.

08:02:55

Your Honor, Plaintiffs respectfully move under Rule 50(a) for judgment as a matter of law on four issues, infringement, validity, willful infringement, and damages.

THE COURT: Just one minute. Infringement, validity, willfulness, and damages.

MR. TEZYAN: Yes, Your Honor.

THE COURT: Okay. Let me then ask whoever is going to speak for Defendants to give me a same indication from the podium, please.

MS. BAILY: Thank you, Your Honor. Melissa Baily for Defendants.

Non-infringement, invalidity, no willfulness, no damages, and marking defense.

THE COURT: So effectively, Ms. Baily, the same four topics Plaintiffs' counsel mentioned, additionally marking.

08:04:00

MS. BAILY: That's right, Your Honor.

THE COURT: Okay. All right, then. Let's hear argument on the infringement/non-infringement issue. Plaintiff bears the burden on this issue, so let me hear from Plaintiff first.

MR. TEZYAN: Plaintiffs move for judgment as a matter of law that no reasonable jury could find that Samsung has not literally infringed the patents-in-suit. Pictiva showed infringement both literally and for some elements under the doctrine of equivalents for each

08:04:37

asserted patent via Samsung and third-party documents, as well as through the testimony of Dr. Schanze, Mr. Humphrey, and admissions of Defendants' experts, Dr. Katona and Dr. Kymissis, on cross-examination, as well as the admissions of Samsung corporate representatives, including

Dr. Seo, Mr. Kwack, Mr. Park, Mr. Kwon, and Mr. Jo.

With respect to the '389 patent, Pictiva presented evidence that each element of Claim 34 and Claim 35 was satisfied. Defendants only contested the selective deposition limitation of these claims. And Mr. Humphrey testified that Samsung selectively deposits the planarization layer on the devices using the same monomer design for each accused device, and his testimony was supported by Samsung's documents and the testimony of Samsung's corporate representative, Mr. Kwack.

08:05:36

Mr. Humphrey also explained that any subsequent cleanup of uncrosslinked planarization material was consistent with selective deposition, as confirmed by the testimony of Mr. Bae, Mr. Kwack, and as consistent with the '389 patent's invention disclosures.

Moving on to the '223 patent, Dr. Schanze provided testimony and evidence that each element of Claims 1, 2, and 9 were infringed. Samsung only contested whether lithium Q is a metal complex with a central metal atom and whether joint vaporization occurs, as required by the claims, for all of the claims. And for Claim 2 specifically, Samsung contested whether there was coordination between the organic compound and metal complex.

08:06:26

And so starting off with the joint vaporization,

08:07:26
08:08:01

Dr. Schanze explained that in the electron transport layer of the accused products, the mixed electron transport layer is formed through joint vaporization of lithium Q and triazine. And that was supported by the testimony of Mr. Jo and Samsung's simulation data for the accused products. And that's JX-6.

As for the metal complex having a central metal atom, Dr. Kymissis admitted that lithium Q is present in the accused products in the hexameric form, and in the hexameric form, the lithium is central.

Now, moving on to Claim 2 of the '223 patent, Dr. Schanze explained through the Kang paper that a coordination bond is formed between lithium Q, which is the metal complex, and the organic compound.

THE COURT: Counsel, I'm happy for you to walk through all the evidence on every claim, but at the end of the day, the question is, could any reasonable jury find based on that evidence. The Court's heard all the evidence, and I'm aware of it, so just a review of everything that came in on each claim I don't know is going to be helpful to the Court at this juncture. I'd really prefer to hear why in totality you believe it either does or doesn't meet the 50(a) threshold.

MR. TEZYAN: Understood, Your Honor. I'll move on.

For the '425 patent, specifically Claim 2, Samsung only disputed that lithium Q acted as an n-dopant in the accused devices. And Samsung's corporate representative, Ms. Seo, testified that -- both at deposition and trial that Samsung's products include lithium Q to support electron injection into the cathode which increases the number of electrons. And that's consistent with Dr. Schanze's testimony that n-doping is the act of increasing the number of electrons in a material. And so we believe, based on those admissions, that JMOL is proper.

08:08:54

And moving on to the '547 patent, Pictiva presented extensive evidence that Claims 1 and 8 were literally infringed. And here, Dr. Schanze explained that Elements 1[a] and 1[f], which were the only contested elements aside from the structured layer, were met because in Samsung's products, the organic layer sequence emits a blue light.

And for the structured layer limitation, Dr. Katona admitted that for the red QD, green QD, and white QD at the top of the structured layer, those areas are arranged laterally.

08:09:35

And so moving on to the '164 patent, Pictiva presented extensive evidence that Claims 1, 5, 6, and 9 were infringed. The only dispute was whether the three materials Mr. Humphrey identified as matrix materials were

present in the same organic functional layer. And we submit, based on the admissions of Dr. Kymissis, that no reasonable jury could find otherwise.

And that is all I have for infringement, Your Honor.

THE COURT: All right. Let me hear counter arguments from Defendants and affirmative arguments on their non-infringement position.

MS. BAILY: Great. Thank you, Your Honor.

08:10:29 Defendants oppose the motion that was just made and also move for judgment as a matter of law under Rule 50(a) that Defendants do not infringe any asserted claim of the asserted patents.

No reasonable jury could find that Defendants practice all of the limitations of the asserted patents. Plaintiffs attempted to carry their burden through Dr. Schanze and Mr. Humphrey, but they failed to give the jury a basis on which to find that the limitations were present because their analysis was just a conclusory 08:11:05 recitation of what the limitations are, not a concrete -- concrete opinion about how they are found in Defendants' products and processes.

Defendants rely on the entire record and all of the evidence adduced at trial, but cites as examples Dr. Schanze's testimony on Pages 281 to 479 of the trial

transcript and -- and Mr. Humphrey's testimony at Pages 478 to 582 of the trial transcript.

Your Honor, at this time, I'd like to give a few illustrative examples without walking through all of the evidence related to each one.

THE COURT: Please proceed.

MS. BAILY: Samsung moves for judgment as a matter of law under Rule 50(a) that Defendants do not infringe any asserted claim of the '164 patent literally or under the doctrine of equivalents. Every asserted claim of the '164 patent requires at least one organic functional layer that has at least a first matrix material, a second matrix material, and a third matrix material.

08:12:01

At trial, Pictiva's technical expert, Mr. Humphrey, in every instance, identified the accused matrix materials as materials in different layers that serve different functions, including but not limited to at the trial transcript 499:15 to 21. These opinions are insufficient to provide the jury with a basis to find infringement of the '164 patent.

08:12:37

No reasonable jury could find that Defendants practice the '164 patent under the doctrine of equivalents. The use of the doctrine of equivalents to establish infringement is limited by the doctrine of prosecution history estoppel.

During '164 -- during the '164 prosecution, the applicants' claims were all rejected as anticipated by the prior art reference Forest. To overcome anticipation, the applicant added the limitation, quote, the organic functional layer is an emission layer and is doped with at least one emitter material.

At trial, Mr. Humphrey testified that that limitation of the '164 patent is infringed under the doctrine of equivalents, including at transcript 514:22 to 518:17.

08:13:29

These opinions are insufficient to establish infringement under doctrine -- under the doctrine of equivalents in view of prosecution history estoppel.

Samsung moves for judgment as a matter of law under Rule 50(a) that Samsung does not infringe any asserted claim of the '389 patent. And just to be clear for the record, when I'm saying Samsung, I mean Defendants collectively.

With respect to the asserted claims of the '389 patent, there is no legally sufficient evidentiary basis from which a reasonable jury could find that at least the following limitations have been met either literally or by the doctrine of equivalents: Selectively depositing at least one planarization layer upon said devices and selectively depositing at least one barrier layer over said

08:13:57

planarization layer.

Samsung moves for judgment as a matter of law under Rule 50(a) that Samsung does not infringe any asserted claim of the '425 patent.

With respect to the asserted claims of the '425 patent, there is no legally sufficient evidentiary basis from which a reasonable jury could find that at least the following limitation has been met either literally or by the doctrine of equivalents: Wherein the organic layer

08:14:47

sequence comprises an electron transport layer that is n-doped.

Samsung moves for judgment as a matter of law under Rule 50(a) that Samsung does not infringe any asserted claim of the '547 patent.

With respect to the asserted claims of the '547 patent, there is no legally sufficient evidentiary basis from which a reasonable jury could find that at least the following limitation has been met either literally or by the doctrine of equivalents: An organic layer sequence

08:15:17

which emits an electromagnetic radiation having a first wavelength spectrum during operation wherein the filter layer is transparent to the electromagnetic radiation having the first wavelength spectrum.

Also, with respect to the asserted claims of the '547 patent, there is no legally sufficient evidentiary

basis from which a reasonable jury could find that at least the following limitation has been met either literally or by the doctrine of equivalents: Wherein the first and second regions of the structured layer are arranged laterally in a beam path of the optoelectronic device.

Samsung moves for judgment as a matter of law under Rule 50(a) that Samsung does not infringe any asserted claim of the '223 patent.

With respect to the asserted claims of the '223 patent, there is no legally sufficient evidentiary basis from which a reasonable jury could find that at least the following limitations have been met either literally or by the doctrine of equivalents: Wherein the organic compound coordinates to the metal complex due to joint vaporization, wherein the electron conducting layer is obtained by joint vaporization of a metal complex which comprises a central metal atom with an organic compound.

And that's it, Your Honor.

THE COURT: All right. Thank you.

Let's turn next to the issue of invalidity as raised by Defendants and validity of the asserted claims as raised by the Plaintiff.

Defendants have the burden of proof here. Let me hear from Defendants first on this issue.

MS. BAILY: Thank you, Your Honor. Defendants

move for judgment as a matter of law under Rule 50(a) that the asserted claims of each of the asserted patents are invalid.

Defendants have met their burden on invalidity and are entitled to judgment as a matter of law. Defendants' expert presented unrebutted testimony on invalidity. Plaintiffs did not call its experts to present any validity opinions in response to Defendants' invalidity case.

Defendants move on all evidence adduced at trial.

08:17:34 For example, with respect to the '389 patent, the evidence -- sorry, Defendants have met their burden on invalidity with respect to the evidence of Jones, which is JX-35. Jones, JX-35, anticipates and renders obvious the asserted claims with Burrows, which is JX-39, and/or Yamazaki, which is DX-31. The evidence that supports those is at the Transcript Pages 901 to 906.

Also, Defendants haven't met their burden on invalidity with respect to the Ni reference, JX-34, which anticipates and renders obvious the asserted claims of the

08:18:19 '389 patent with Jones, JX-35.

The relevant evidence is at the Trial Transcript 901 to 906.

For the '425 patent, Defendants have met their burden on invalidity with respect to Kondakova, DX-32, anticipating and rendering obvious the asserted claim of

the '425 patent.

Also, with respect to the iRiver Clix2 device described in DX-7, DX-8, DX-10, DX-13, and other evidence and testimony which anticipates and renders obvious the asserted claim with Wei, which is at JX-48, the relevant testimony is at the trial transcript at Pages 920 to 922.

Further, the evidence is unrebutted and Defendants have met their burden on invalidity with respect to invalidity for improper inventorship of the '425 patent. The evidence is at 9 -- examples of the evidence are at 910 to 913 of the trial transcript.

Next, with respect to the '547 patent, the Defendants have also met their burden on invalidity and are entitled to judgment as a matter of law with respect to Igarashi, JX-59, that both anticipates and renders obvious the asserted claims of the '547 patent with Kido, JX-49. Exemplary transcript cites are at 930 to 932 and at 949.

For the '164 patent, Defendants have met their burden on invalidity and are entitled to judgment as a matter of law with respect to the Clix2 which anticipates and renders obvious the asserted claims alone or with Choulis, JX-31. Exemplary record cites are at Page 1089 to 1092.

For the '223 patent, the Defendants have also met their burden on invalidity and are entitled to judgment as

a matter of law with respect to the Clix2 which anticipates the asserted claims. Exemplary transcript cites are at 1041 to 1043.

Samsung's expert -- experts presented unrebutted testimony on these issues as Pictiva did not call its experts in rebuttal to present any validity opinions. Samsung has met its burden and is entitled to judgment as a matter of law. And just to be clear, the record cites I provided with respect to invalidity are exemplary only.

08:21:05 THE COURT: Counsel, just so I'm clear, are you taking the position, and if so, what is your position on the issue of inventorship?

MS. BAILY: Yes, Your Honor. Our position is that the '425 patent included improper inventors -- inventors that did not contribute to the claims of the patents. And there was evidence that that -- there was evidence of that in the trial transcript at Pages 910 to 913, and it was unrebutted. And we believe judgment as a matter of law should be granted.

08:21:37 THE COURT: All right. Anything further on this category?

MS. BAILY: No, Your Honor.

THE COURT: Let me hear from Plaintiff in response, please.

MR. TEZYAN: Thank you, Your Honor.

Plaintiffs oppose Defendants' motion and move for judgment as a matter of law that no reasonable jury could find that Samsung has proven the asserted claims are invalid because Samsung has failed to meet its burden.

I'd like to start with the '425 patent, and specifically the issue of improper inventorship. And just by way of background, Judge Payne allowed Samsung to present its improper inventorship defense with respect to the '425 patent on the condition that, quote, the Court

08:22:27

finds that Diekmann fully anticipates the '425 patent. And that was the theory Judge Payne allowed the Defendants to proceed on improper inventorship on, and that's Docket 512 at 7. And Your Honor's order adopting that Report and Recommendation is at Docket 555 at 2.

We didn't hear anything about Diekmann from Dr. Katona. Diekmann is not even in evidence, and so there is no way that Samsung can meet its burden on its improper inventorship defense.

And what Samsung did instead was completely change

08:23:04

its inventorship theory at trial by comparing one group of inventors from Kiska and their technological contributions to another group of inventors who are involved in the '547 patent at OSRAM. And that was not the theory that Judge Payne allowed the improper inventorship defense to proceed on.

08:23:56 For the '389 patent, Samsung has not met its burden to show that Claims 34 or 35 were rendered obvious by either of the prior art combinations, such as Jones, '220; Burrows '217; and Yamazaki, '166. Nor did Dr. Katona provide any testimony or evidence of a motivation to combine these references or an explanation of how a person of ordinary skill would expect their sealing structures to work together.

And for similar reasons, Pictiva is entitled to judgment as a matter of law for the combination of Ni and Jones, '220.

Moving on to the '223 patent, the only invalidity defense that was presented was anticipation under Clix2 and Samsung's witness, Mr. Jo, who testified that there was no joint vaporization in the manufacturing of Clix2, and so we believe JMOL is warranted there, too.

08:24:39 As for Samsung's obviousness theory based on Clix 2 and Wei, Dr. Katona admitted that Clix2 was not n-doped, and Dr. Katona provided insufficient evidence of motivation to combine. And so JMOL is warranted as to that combination, as well.

Kondakova, Dr. Katona, again, failed to prove that the electron transport layer was n-doped with lithium Q, as required by the claims. And so judgment as a matter of law is warranted there, as well.

For the '547 patent, the combination of Igarashi and Kido, Defendants have not shown that that combination discloses all of the limitations of the claim, and Dr. Katona did not provide a motivation to combine to meet Defendants' burden.

Finally, for the '164 patent, Dr. Kymissis presented an anticipation or obviousness theory based on the Clix2 reference and another reference called Choulis.

As for the Clix2 theory, Dr. Kymissis acknowledged that he had to rely on three matrix materials that were not adjacent to each other to satisfy the limitations of each asserted claims. And so we believe that renders the anticipation theory fatally flawed.

And the combination with Choulis, insufficient evidence of motivation to combine was provided by Dr. Kymissis. And so we believe judgment as a matter of law is warranted on that theory, as well.

Does Your Honor have any questions for me?

THE COURT: Return with me, again, to the marking -- excuse me, to the inventorship issue on the '425 patent.

Is the argument from the Defendants, as you understand it, there were too many people included as inventors or not enough people claimed as inventors added? In other words, was an actual inventor left out, or was

someone who is not an inventor added in, or was it presented both ways? And put it in that context, if you will, and let me hear your position.

MR. TEZYAN: Sure. My understanding of their argument, Your Honor, is that there was a group of inventors at Kiska who were left off of the '425 patent. And the way they tried to prove this at trial is by showing some images from a document that had to do with a Kiska invention disclosure, I believe, and then showing that these images were also in the '425 patent. And so in that way they tried to say there were inventors left off of the '425 patent. And I believe that was their theory. But that was not the theory that Judge Payne allowed them to proceed with the improper inventorship defense on based on Diekmann.

THE COURT: All right. Thank you, counsel.

MR. TEZYAN: Thank you, Your Honor.

THE COURT: Ms. Baily, I'm going to give you one last opportunity to talk about inventorship in light of that further discussion, just because I want to be completely clear on the competing positions of the parties.

MS. BAILY: Yes, Your Honor. Thank you. So--

THE COURT: Is it your position that an improper person who was not an inventor was included, or is it your position that a proper inventor was left out?

MS. BAILY: So there are two issues. Mr. Diekmann should have been included as a named inventor, and the Kiska inventors shouldn't be on the patent. I don't -- I'm trying to pull up right now Judge Payne's ruling. I don't believe we were limited to one theory or the other, but I -- I don't have it in front of me, Your Honor.

THE COURT: All right. Thank you.

Let's go on to the issue of willfulness, as urged by Plaintiff, and JMOL of no willful infringement, as urged by Defendants.

08:28:28

Let me hear from Plaintiff first on this, please.

MR. TEZYAN: Plaintiffs move for judgment as a matter of law that no reasonable jury could find that Samsung has not willfully infringed the asserted claims of the patents-in-suit based on all the evidence that was presented in the case.

As just an example, Pictiva sent multiple notice letters to Samsung informing it of its infringement of the '389, '164, and '223 patents.

08:29:10

Pictiva presented other evidence showing that Samsung has been aware of Pictiva's patented technologies for the initiation of its lawsuit and acted with reckless disregard of a risk of patent infringement by continuing to make, use, sell, and offer for sale the infringing products in the United States after being put on notice of Pictiva's

technologies.

As Dr. Quinlan's testimony established and as the admissions of Samsung's in-house attorney, Ms. Kim, established, Samsung failed to respond to Pictiva's notice letter, and that is probative of willfulness here.

And in addition, Samsung continues to sell the infringing products today, two years after the lawsuit was filed. And this post-suit conduct is evidence of willful infringement that we believe establishes that judgment as a matter of law as to willfulness should be granted.

08:30:13

None of Samsung's witnesses testified to any basis for a good-faith belief in non-infringement or invalidity, and several of its engineers testified that Samsung had not assessed or asked its suppliers to assess whether it infringed.

And, therefore, Plaintiffs respectfully request that the Court enter judgment in favor on the issue of willfulness.

Thank you, Your Honor.

08:30:39

THE COURT: All right. Let me hear from Defendants, please, on this issue.

MS. BAILY: Thank you, Your Honor.

Defendants oppose Plaintiff's motion and move for judgment as a matter of law under Rule 50(a) that it does not -- that they do not willfully infringe any asserted

claim of the asserted patents.

Just for context, the Court granted summary judgment of no pre-suit willful infringement for the '547 and '425 patents already. That's Docket 506.

Defendants' Rule 50(a) motion should be granted as to no pre-suit willful infringement for the remaining asserted patents and no post-suit willful infringement of any asserted patents.

Willfulness requires deliberate and intentional

08:31:23

conduct. Even if Defendants knew of the patents, Plaintiffs would have to show the conduct was willful, wanton, malicious, bad faith, deliberate, consciously wrongful, flagrant, or characteristic of a pirate under the Halo standard.

As to pre-suit willfulness on the '223, '389, and '164 patents, there is no evidence of such conduct. The Defendants in this case understood and relied on Samsung Display to interface with Pictiva on the issues raised by -- by Pictiva pre-suit. And Samsung Display engaged

08:32:02

with Pictiva on the merits of the patents that the parties agreed to address during their negotiations.

Sorry, Your Honor.

The 50(a) should also be granted on no post-suit willful infringement. Samsung brought good faith and meritorious non-infringement and invalidity defenses,

including the ones we've already discussed today, and there was no deliberate or intentional conduct that can meet the Halo standard.

Samsung also moves for JMOL of no willful infringement of the '389 patent because there are no damages to be awarded with respect to that patent, and so there is no reason to consider willful infringement with respect to the '389.

THE COURT: All right. Thank you, counsel.

08:33:04 Let's move to the topic or subject of damages. Plaintiff has moved for judgment as a matter of law that its damages theories should be established as a matter of law. Defendants have moved that that there should be, as a matter of law, no damages awarded.

Let me hear from both parties on this topic, with the Plaintiff going first.

MR. TEZYAN: Plaintiff respectfully moves for judgment as a matter of law on damages, together with interest and costs as fixed by the Court, under 35 U.S.C. 08:33:49 284 for the '547 patent, '164 patent, '223 patent, and '425 patent.

Plaintiffs have proven as a matter of law that they are owed damages for Samsung's infringement of the patents-in-suit. Plaintiff's damages expert, Mr. David Kennedy, testified in this case that he calculated a

reasonable royalty based on the apportioned value of the patented technology as compared to the next best alternatives as determined by Dr. Schanze and Mr. Humphrey.

Based on all this evidence, Mr. Kennedy testified that a reasonable royalty would be 98.8 million for the '547, 234.2 million for the '164 patent, 242.8 million for the '223 patent, and 92.6 million for the '425 patent.

That analysis was based on Samsung's sales records showing that Samsung made, used, sold, or offered for sale

08:34:51

65.47 million infringing mobile devices for the '164 and '223, 28.44 million infringing mobile devices for the '425, and 1.32 million infringing TVs and monitors for the '547.

Mr. Kennedy's analysis was based on the entire evidence of the record and the survey conducted by Dr. Marais, testing the willingness of Samsung's customers to pay for the benefits of the patents-in-suit, Samsung's internal documentation, as well, and Mr. Kennedy's analysis of the Georgia-Pacific factors.

Mr. Kennedy explained that his analysis is

08:35:32

conservative in a number of ways, including that he used the lowest average sales price to calculate the economic benefits for each patent and applied the royalty rates for smartphones to more expensive PCs and tablets without adjusting upwards.

And so for these reasons, Plaintiff has met its

burden to establish damages, and the Court should enter judgment as a matter of law on the figures presented by Mr. Kennedy.

Thank you, Your Honor.

THE COURT: What's the responsive argument and argument to the opposite conclusion from Defendants?

MS. BAILY: Thank you, Your Honor.

Samsung opposes the motion that was just made and respectfully moves under Rule 50(a) that Plaintiffs have 08:36:12 not met their burden of proof as to damages.

Plaintiffs did not provide the jury with an evidentiary base from which the jury could make any logical or well-supported award of royalties or damages.

With respect to the '389 patent, there is no evidence in the record from which a fact finder could formulate a royalty, and we understand the jury is not going to be asked to provide damages on the '389 patent.

Samsung is also entitled to a finding of no damages for the '164, '223, '425, and '547 patents because 08:36:47 Mr. Kennedy's damages opinions are not properly apportioned or sufficiently tied to the footprint of their purported inventions.

First, the technical benefit numbers on which Mr. Kennedy's analysis is based are not tied to the claimed inventions. Pictiva's technical experts determined the

purported benefits based on literature and tests that have nothing to do with the patents-in-suit.

The survey on which Mr. Kennedy relies to determine his royalty figures is not tied to the footprint of the claimed inventions. It did not use the same technical benefits provided by Pictiva's technical experts.

Mr. Kennedy's attempts to tie the survey results to technical benefits that Pictiva's technical experts did provide through linear interpolations and extrapolations are unreliable. He identified no support for assuming linearity. Mr. Kennedy's use of such mathematical assumptions renders his methodology fundamentally flawed and over inflates damages.

These failures and others violate apportionment law and warrant granting of this 50(a) motion.

THE COURT: All right. Thank you.

Let's turn to the marking defense, and let me hear from the Defendants on this first.

MS. BAILY: Samsung respectfully moves for judgment as a matter of law under Rule 50(a) that Plaintiffs have failed to establish their burden to show that any licensee marked their products sufficient to provide constructive notice.

Under 35 U.S.C. Section 287(a), if a patentee makes a patented article or licenses its patent to a

licensee who makes a patented article, it may not recover damages for any infringement prior to providing actual notice unless its or any licensee's products are marked.

It is the patentee's burden to provide -- to prove it provided actual notice of infringement if provided constructive notice through marking.

An accused infringer bears the initial burden to identify products it believes needs to be marked. This is a low bar, and once a Defendant's burden is satisfied, the 08:39:15 patentee bears the burden to prove the products identified do not practice the patented invention.

When Samsung moved for partial summary judgment on its marking defense, the Court concluded that Samsung had satisfied its initial burden of production with respect to marking through its Arctic Cat letter regarding LG Display products.

Accordingly, for trial, the burden shifted to Pictiva to prove that LG Display products Samsung identified were marked or do not practice the claimed 08:39:44 patented inventions under LG Display's license to the patents-in-suit.

Pictiva has presented no evidence at any point during trial that any of the LG Display products Samsung identified in its Arctic Cat letter were properly marked or that Pictiva made reasonable effort -- efforts to ensure LG

Display complied with the marking requirements. There was no marking provision in the LG Display license.

Pictiva also presented no evidence that LG Display did not practice one or more of the asserted patents. Plaintiffs have thus failed to establish that it has complied with Section 287(a) for any period prior to when it provided actual notice of infringement.

Accordingly, Samsung requests that the Court enter judgment as a matter of law that Pictiva is not entitled to any damages for any asserted patent before the date when actual notice of infringement related thereto was given.

08:40:36

The earliest possible date for actual notice for each of the asserted -- asserted patents is as follows:

For the '223 and '164 patents, the date is August 17, 2021, the date that Pictiva sent a letter to SEC. That's PX-06. And my understanding is Mr. Kennedy did calculate damages from August 17, 2021.

But with respect to the '547 patent, the earliest possible date for actual notice is October 19, 2023, the service of the original complaint.

08:41:16

And for the '425 patent, the earliest possible date for actual notice is March 1, 2024, the service of the first amended complaint.

Thank you, Your Honor.

THE COURT: Let me hear from Defendant -- excuse

me, Plaintiffs on this.

MR. TEZYAN: Thank you, Your Honor.

Plaintiffs oppose the motion, though I think there's some agreement that -- for the '164 and '223 patents. Plaintiffs put forward evidence as of August 17th, 2021 -- I believe that was PX-6 -- that Pictiva had provided actual notice of infringement to Samsung. And Mr. Kennedy testified that he limited the damages for those patents in his analysis to the date of that notice letter.

08:42:22 For the '547 patent, Dr. Schanze gave uncontested testimony that LG Display's WOLEDs do not practice the '547 patent because the WOLEDs do not use color conversion. And that's at Trial Transcript 399:2 through 20.

For the '425 patent, it was Samsung that took the position that neither LG Display nor OSRAM ever practiced the asserted -- the asserted parent patents. And so that's at Trial Transcript 191:5 through 20.

And for these reasons, we would oppose Defendants' motion.

08:43:11 THE COURT: Let me ask you this, counsel. If the burden shifted back to Plaintiff on this issue pursuant to the Defendants' Arctic Cat -- Arctic Cat notices, I did not hear Mr. Kennedy give the jury testimony that would have -- would have indicated what post-suit units sold or resulting damages would be. I only recall hearing testimony from

Mr. Kennedy as to the entirety of the damages model as if there were no marking defense.

Mr. -- Dr. Perryman only gave a $1.7 million number and didn't tie it to any point in time or any number of units sold. He just gave a global $1.7 million number that Defendants believe should be the maximum damages.

If there is a marking defense that applies here or if the -- if the issue of marking goes to the jury, and the jury finds that Plaintiffs failed to meet their burden, what evidence is there in the record that the jury can rely on, other than what Dr. Perryman testified to, but what testimony from Mr. Kennedy does the jury have to rely on if Plaintiffs failed to meet their marking obligation, their burden, as to post-suit damages, or is the jury just left to guess because nobody's told them what the damages would be if the Defendants' marking defense were to attach other than the '164 and the '223 where there may be agreement of the parties, but we have -- we have at least two other patents in this case.

08:44:46

08:45:29

MR. TEZYAN: Your Honor, may --

THE COURT: So where would the jury be?

MR. TEZYAN: Your Honor, may I consult with my colleague Jeffrey Linxwiler in the gallery who knows these issues better than I do?

THE COURT: You can take a moment.

MR. TEZYAN: Thank you, Your Honor.

Your Honor, with the caveat that I don't have the trial transcript in front of me --

THE COURT: And I'm not -- by asking the question, I'm not saying that that consideration should drive the Court's decision on JMOL. I'm trying to consider all the eventualities and what the jury will be confronted with when they're charged, and I'd just like your input on that topic.

08:46:45 MR. TEZYAN: Thank you, Your Honor.

I can address that with the '547 patent. I believe that most of the units that are at issue are closer to the date of actual notice because the QD-OLED products were released in 2022. I'm trying to find the citation for that.

THE COURT: And the amended complaint in this case was filed in 2023, correct?

MR. TEZYAN: I believe the '547 patent was asserted in -- yes. So Your Honor is correct, the 08:47:25 complaint that asserted the '547 patent was October 19th, 2023.

THE COURT: What's your answer to this question with regard to the '425 patent? In other words, where is the jury if they determine that pre-suit damages are not awardable? Did they have evidence to look to from either

expert on what the damages would be under that eventuality, given that there's been a marking defense alleged in the case, and that's known to the parties and known to the experts at the time they offered their testimony?

MR. TEZYAN: Your Honor, without looking at the trial transcript, again, I apologize, I'm not sure for the '425 patent.

THE COURT: All right. Ms. Baily, do you have any additional insights on the questions I've just asked that you might wish to offer?

08:48:40

MS. BAILY: Yes, Your Honor. I think Your Honor already mentioned it, but I do think the only evidence in the record that would apply if the marking -- if the jury were to find that the marking defense applies, would be Mr. Perryman's analysis which is a lump sum based on comparable licenses, and so the unit numbers don't -- don't affect the calculation of the damages.

THE COURT: In other words, you're not aware of anything as far as an alternative from Mr. Kennedy that gives the jury a version of his damages theory with pre-suit damages and a version of his theory without pre-suit damages?

08:49:21

MS. BAILY: That's my understanding.

If I could just mention one thing on the substance of the 50(a) motion itself. I'd just like to point out

that Dr. Schanze's testimony regarding QD-OLED displays and LG Display, which was mentioned by counsel for Plaintiffs, is insufficient to establish that those products do not practice the patents. In our view, it was conclusory.

THE COURT: All right. Is there anything further from either party pursuant to Rule 50(a) of the Federal Rules of Civil Procedure?

Anything additional from the Plaintiff?

MR. TEZYAN: No, Your Honor.

08:50:34 THE COURT: Anything additional from the Defendants?

MS. BAILY: No, Your Honor.

THE COURT: All right. Counsel, having heard your arguments with regard to these matters, it's the Court's judgment that concerning the issue of infringement or non-infringement, as affirmatively moved for by both parties, both motions are denied.

With regard to the areas of validity or invalidity, again, where both parties have moved

08:51:08 affirmatively for relief, both motions are denied.

With regard to the issue of willfulness or willful infringement where both parties have affirmatively moved for relief under JMOL, both motions are denied.

With regard to damages where both parties have moved affirmatively under JMOL, both motions are denied.

And with regard to the marking defense under Section 287 where the Defendants have moved affirmatively, that motion is denied.

That completes practice under Rule 50(a).

It is a few minutes until 9:00 o'clock. I would like to meet with counsel in chambers at 9:30 to begin the process of an informal charge conference. Certainly, those of you present are welcome. And if there are members of your trial teams that are preparing to address the issues related to the charge and the verdict form, they certainly should join us, as well.

08:52:11

But we'll take a recess until 9:30, and then those of you involved in that are invited to meet the Court in chambers.

MS. BAILY: Your Honor, if I may?

THE COURT: Ms. Baily, do you have something?

MS. BAILY: Yes, please, Your Honor.

There were two issues raised in briefing by the Plaintiffs last night, and we'd like to address them before your Court rules -- before Your Honor rules, I'm sorry, whenever makes the most sense. It doesn't have to be now, although I'm prepared to address them now.

08:52:34

THE COURT: Well, I'm not sure how I'll respond to what you have, but why don't you just go ahead and raise the issues that are on your mind.

MS. BAILY: So the first, the Plaintiffs made a motion for a curative instruction for Defendants' alleged violation of a MIL with respect to the indemnification agreement.

So would you like me to present my argument on that, Your Honor, or --

THE COURT: Just for purposes of efficiency and time-saving, let's go ahead and just hear briefly on that.

MS. BAILY: Okay. So, Your Honor --

08:53:32 THE COURT: I'm familiar with the underlying circumstances.

MS. BAILY: Oh, okay. Well, so obviously --

THE COURT: Why do you think a curative instruction should not be given?

MS. BAILY: Well, the indemnification agreement was pre-admitted, and Judge Payne allowed us expressly to argue that the indemnification agreement was the reason why Samsung Electronics understood that Samsung Display was interfacing with Pictiva regarding the relevant issues.

08:54:00 THE COURT: And there was no timely objection by the Plaintiff. In fact, I'm the one that raised it with the party after it had come into evidence without objection at a subsequent bench conference.

MS. BAILY: That's true, Your Honor.

THE COURT: All right. Do you want to speak to

this at all, counsel for Plaintiff?

MR. TEZYAN: No, Your Honor. We stand on the briefs.

THE COURT: All right. Is there another issue you'd like to raise, Ms. Baily?

MS. BAILY: There was another brief filed with respect to whether and what the Defendants might be able to say in closing with respect to, in particular, the TOF-SIMS incident with respect to the undisclosed demonstratives.

08:54:41 THE COURT: All right.

MS. BAILY: Can I be heard on that issue, Your Honor?

THE COURT: You can be heard on it, yes.

MS. BAILY: Okay. So, Your Honor, we believe that's the -- that the request should be denied.

Now, I don't anticipate that either Mr. Gillam or Mr. Pak are going to engage in any personal attacks with respect to counsel on the other side. However, Plaintiffs' counsel has argued throughout in front of the jury that 08:55:11 Samsung has been hiding things from the jury. And I expect in closings, that my colleagues will address that and should be permitted to address that.

There's no reason to believe that either -- either Mr. Pak or Mr. Gillam are going to engage in any improper ad hominem attacks, but I think that they should be

entitled to raise the issues that have been repeatedly raised in front of the jury regarding who is hiding what.

THE COURT: All right. Does Plaintiff stand on its briefing, or does Plaintiff wish to add some argument?

MR. TEZYAN: Yes, Your Honor, we stand on our briefs.

THE COURT: All right. Well, with regard to the request for an express instruction to the jury on the indemnification issue, that request is denied. The Court 08:55:57 finds that it was not timely raised by Plaintiff, and there is additional support in the pretrial record from Judge Payne.

But even if there weren't, the issue was not raised by the Plaintiff's counsel until well after the matter was injected before the jury. And, again, only the Court asked a question about the propriety of it subsequent to its presentation to the jury in a conference with counsel at the bench.

And as I recall, Mr. Sheasby acknowledged he 08:56:34 didn't raise any objection to it at the time.

So it's clearly untimely in my view.

With regard to the other requested matter, I'm going to carry that. And I suspect that the -- I may want to give a ruling on that which includes precise guidance when both -- when the three attorneys that are going to

present closing argument are here and present and able to hear the guidance that I give them. So I'll carry that motion.

MS. BAILY: Thank you, Your Honor.

THE COURT: All right. I will see those of you that are involved in the charge conference in chambers at 9:30.

The Court stands in recess.

COURT SECURITY OFFICER: All rise.

08:57:13 (Recess.)

COURT SECURITY OFFICER: All rise.

THE COURT: Be seated, please.

Counsel, after discussions with the Court and by agreement of the parties, I'm going to reopen practice under Rule 50(a) for a single limited item.

Let me ask if Defendant has anything additional to what's already been presented to the Court pursuant to Rule 50(a) that they care to seek relief on?

MS. BAILY: Yes, Your Honor. Thank you.

09:57:39 Defendants respectfully move under Rule 50(a) that Plaintiffs have not met their burden of proof as to damages with respect to the '389 patent.

With respect to the '389 patent, there is no evidence in the record from which a factfinder could formulate a royalty for any damages number. The Federal

Circuit has held in upholding a grant of judgment as a matter of law of no damages that the patent damages statute does not require an award of damages if none are proven that adequately tie a dollar amount to the infringing acts. This is the Rex Med. Federal Circuit case, October 2, 2025.

There, the Federal Circuit said there must be at least enough evidence in the record to allow the factfinder to formulate a royalty. Here, there is not enough evidence in the record to allow the factfinder to formulate a royalty, and so we would request a ruling under 50(a) of no damages with respect to the '389 patent.

09:58:29

THE COURT: All right. Let me hear from the Defendant -- excuse me, from the Plaintiff in response.

MS. TRUELOVE: Your Honor, Plaintiff, of course, believes there is sufficient evidence for the factfinder to make a finding of damages. As it's clear under case law, you don't have to have expert testimony in order for the factfinder to consider damages. If they do find that the patents are valid and infringed, the '389 in particular, the evidence that they have where they could -- could use in order to reach a damages determination is specifically Mr. Humphrey testified as to the '389 that there's no infringing alternative. He also provided testimony as to what the infringing products were.

09:59:09

Then Mr. Kennedy provided testimony right out of

the bat as to the '389, how many infringing units that there were, specifically 57.2 million units. He also testified as to what the average selling price of the phones were, which was $637.87.

He provided testimony about how you go about calculating a reasonable royalty. The jury had testimony on the Georgia-Pacific factors and things that they could consider.

So we believe that there is sufficient evidence 10:00:02 for the jury to reach a damages number if they find that the patent is valid and infringed.

We also have time remaining in our case, and so to the extent that the Court would allow, we would certainly be able to put Mr. Kennedy on to -- to provide additional factual information -- not a reasonable royalty analysis, but additional factual information about the '389 patent. But even without his testimony, I think there's sufficient evidence that the jury could use to find a damages number in this case.

10:00:33 THE COURT: All right. Thank you, Ms. Truelove.

Ms. Baily, you have something further?

MS. BAILY: Only if Your Honor permits it.

THE COURT: I'll permit it. I want both sides to be heard fully on this issue.

MS. BAILY: So I just wanted to address the

evidence that was articulated by Plaintiffs' counsel. None of that evidence -- the fact that there's no infringing alternative or testimony is not a fact, so strike reference to fact. But the theory that there's no infringing alternative, the testimony about what the infringing parties are -- products were, the units, and the average selling price, none of that gives any basis for a factfinder to formulate a royalty under the relevant law. None of that would allow the factfinder to tie patent damages to the patented invention and the footprint of the '389 invention.

10:01:21

And so we don't think that there is anything in the record that would allow a damages determination by the jury.

THE COURT: All right. Anything further from either side on this issue?

MS. TRUELOVE: Nothing from Plaintiff, Your Honor.

MS. BAILY: No, Your Honor.

THE COURT: Okay. With regard to Defendants' motion for judgment as a matter of law as to the issue of damages regarding the '389 patent, the Court has looked at this carefully, and the Court is going to grant JMOL as to the damages issue on the '389 patent.

10:01:47

The law seems to be clear that damages must not be left to the conjecture of the jury, and they must be proved

and not guessed at. That's from the Promega case. The Court -- the Federal Circuit there went on to say: Section 284 requires the award of a reasonable royalty, but to argue that this requirement exists even in the absence of any evidence from which a court may derive a reasonable royalty goes beyond the possible meaning of the statute. That's the Devex Corp. versus General Motors case.

And the Court also is persuaded, having looked at the Dow Chemical versus Mee case and the recent Rex Medical 10:03:10 case, that there is no doubt in this case that the Court, having exercised its gatekeeping function under Daubert and in line with the EcoFactor guidance, excluded expert testimony on damages regarding the '389 patent. There were no expert opinions offered to the jury regarding damages on the '389 patent.

The balance of the record before the Court -- as the parties have argued this morning, the Court is persuaded -- does not provide even a modicum of guidance to the jury as to how to set a damages number on the '389 10:03:54 patent. And in keeping with the authorities I've cited, the Court believes that judgment as a matter of law, that there are no damages to be set by this jury regarding the '389 patent, if the jury finds it to be both infringed and not invalid, is the appropriate ruling.

So that's the Court's ruling.

Go ahead, Ms. Truelove.

MS. TRUELOVE: Just for preservation of error purposes, you know, we put our case on the way we put our case on because we were advised by the Court that the jury were not going to be able to consider damages, and -- for the '389 patent.

And so, again, respectfully, we would request to be able to reopen the case. We have time remaining, and we could put on testimony that would satisfy the law, we

10:04:50

believe, in order to provide the information that a jury would need, not expert testimony on a reasonable royalty calculation, but provide them with the information that they would need to get to a reasonable royalty.

We didn't -- we didn't do that because we didn't think we were permitted to do it based on what the Court had instructed.

So I just want to respect the Court's ruling, but wanted to put that on the record to preserve error.

THE COURT: Well, I don't have the exact figures

10:05:19

in front of me, Ms. Truelove. But at the end of the evidence yesterday, the Plaintiff had a mere handful of minutes of designated trial time remaining, and that was with the Court having given both sides additional trial time that was asked for. And there were two designated rebuttal witnesses substantively that the Plaintiff elected

not to call with additional time. And to allow a party to reopen the evidence after hearing an adverse ruling on Rule 50(a), I think would run counter to both fairness and what the rule intends. And, respectfully, I'm going to deny your request to reopen the evidence.

MS. TRUELOVE: I understand, Your Honor. I just -- like I said, wanted to get it on the record for preservation.

THE COURT: You feel like you had to make the motion.

10:06:08

MS. TRUELOVE: Yes.

THE COURT: I understand.

MS. TRUELOVE: Thank you.

THE COURT: All right. Counsel, that completes practice under Rule 50(a). If you would, we'll meet in chambers and take up the charge conference -- the informal charge conference.

The Court stands in recess.

COURT SECURITY OFFICER: All rise.

12:43:37

THE COURT: Be seated, please.

This morning, I met with the parties who presented various motions pursuant to Rule 50(a). The Court heard and ruled on those various motions. After motion practice under Rule 50(a), the Court met with counsel in chambers and informally reviewed the most current iteration of the

12:50:43
12:51:35

final jury instructions and verdict form. After a fulsome and lengthy discussion and an opportunity for everyone to offer whatever input they thought was appropriate and relevant, the Court considered that input and has now generated what it believes to be the appropriate final jury instructions and verdict form for use in this case with this jury. We're going to hold a formal charge conference on the record, but before we do that, the Court needs to take up and deal with certain pending motions that have been filed overnight on the docket and otherwise communicated to the Court.

All right. And counsel who are going to address the matters in the formal charge conference can use this time to further review the materials the Court's furnished them.

But I want to turn to various motions. At the end of the 50(a) conference this morning, counsel for the Defendants raised with the Court Plaintiffs' motion for a curative instruction for Defendants' violation of a MIL on the Samsung, Samsung Display indemnification agreement, which is Document 572 on the docket that was filed overnight before midnight because it's stamped the 30th of October. I indicated at that time that I was not inclined to grant that motion. I reviewed the motion and any response. And in my view, any objection was waived by the

Plaintiff because it was not timely raised.

In fact, the Plaintiff raised no objection to the exchange between Defense counsel and a witness about indemnification until such time as the Court called the parties to the bench subsequently and the Court inquired whether the parties were aware there was a standing order in limine about raising the issue of indemnification.

And at that time, I looked at Plaintiffs' counsel and said: And you've not raised any objection to this.

12:52:41 And Plaintiffs' counsel said, "That's right, Your Honor, I did not object."

And then it was briefly discussed, and we went on to other matters. That's the sum total of what took place with regard to the indemnification issue. And based on what the Court views to be a lack of a timely objection and the other matters that were mentioned at the bench by Defense counsel as to how the indemnification issue had been raised by the Magistrate Judge in pretrial, the Court denies the Plaintiffs' Motion 572 for a curative instruction with regard to the indemnification issue. 12:53:21

Now, there is a second motion filed overnight, as well, by Plaintiffs. It's Document 573. It's Plaintiffs' request to preclude certain statements during closing arguments. This has to do with the Court's curative instruction to the jury regarding Plaintiffs' counsel's

improper use of demonstrative slides in its direct examination of Mr. Humphrey that were not disclosed pursuant to the Court's orders in advance of that examination.

I'd like to hear just very briefly from Plaintiffs' counsel, and then I'll hear briefly from Defense counsel, and then I'll give you guidance on this motion.

Do you have anything to offer, Mr. Sheasby?

12:54:14 MR. SHEASBY: Your Honor, the only thing I would say is obviously, the counsel for Defendants can say there's no TOF-SIMS data in the record on X, and the Judge urged you to -- told you to not consider TOF-SIMS data on whether there's an emitter in the R-prime. But I think any attribution of intentionally improper conduct on the part of Plaintiff would be taking it a step too far. And that's my only distinction I want to make.

It was not intentionally. I recognize that I violated the Court's standing procedure. I freely 12:54:53 acknowledge that I should have given the slides not as I was walking up to do the redirect, but I should have either given them the night before, or I should have just used the actual TOF-SIMS report that I disclosed as opposed to the slide versions of that.

But I -- the attribution that I did something

intentionally malicious is what I'm concerned about, Your Honor. That's it.

THE COURT: All right. Is there a brief response from Defense counsel?

MR. PAK: Yes, Your Honor. Despite our belief that it -- conduct was improper, I will not be making that argument in my closing.

THE COURT: It seems to me, Mr. Pak, that the gist of this motion is Plaintiffs' counsel is concerned about
12:55:41 Defense counsel arguing to the jury that the Plaintiff intentionally ambushed the Defendant in common parlance. And I am not going to permit that, and I'm sure that you don't intend to say that.

MR. PAK: I have no intention of doing that, Your Honor.

THE COURT: However, anything that I said to the jury in the instruction that I gave them on the record, including that the use of those demonstratives was contrary to the Court's order, is appropriate to mention. But
12:56:12 anything beyond the actual instruction the Court gave, you should not raise in closing, nor should Mr. Gillam raise it in closing without advising me in advance and getting leave.

MR. PAK: Thank you, Your Honor.

THE COURT: Understood?

MR. PAK: Understood.

THE COURT: That will be the Court's order in regard to Document 573.

Finally -- I hope finally, the Court received an email from Mr. Sheasby at 10:58 this morning, October the 31st, and it's 12:56 now, so very short time ago, less than two hours, indicating that he intended to ask the Court to excuse Ms. Ruiz, who is juror -- she was originally Juror No. 4, and with the loss of Ms. Fincher, she is Juror No. 3 now. And there's not, to my knowledge, been a formal motion filed on this, but if you would like to make an oral motion at this time, Mr. Sheasby, I'll be glad to hear it.

12:57:07

MR. SHEASBY: So first, Your Honor, I want to be very -- first, I want to thank Your Honor's indulgence for allowing me to make this motion. It's important for my client. And I appreciate the Court's approach.

Second, I also want to acknowledge the broad discretion the Fifth Circuit of the United States gives you in this regard. U.S. versus Jones is a controlling Fifth Circuit case and specifies that the standard for review is abuse of discretion.

12:57:35

The Fifth Circuit in U.S. versus Jones also makes clear that although ex parte communication regarding -- with a juror regarding the subject matter of -- of a case raises a presumption, that presumption also requires some

type of proffer that there would be harm to the party who's raising the concern.

Short answer, my -- the mountain I have to climb here is high, and I don't want to suggest to the Court -- the Court knows the law better than I do, but I'm very sensitive to the fact of the mountain I have to climb, Your Honor.

The concern I have is in short the following. I don't think Mr. Gillam did anything wrong or acted in any 12:58:35 way improperly, and my experience with him and his reputation in this court is sterling. I wish I had the same reputation Mr. Gillam did.

The reality, though, is -- is that I'm not -- I'm uncomfortable, one, that this juror was not completely candid about her view of the depth of the relationship she has with Mr. Gillam. I'm absolutely sure Mr. Gillam doesn't know her from the other hundreds of Marshall residents that he's represented well and effectively over the years, but it's -- based on this email, this text, it 12:59:13 seems to me that her view of the relationship is perhaps deeper than she indicated in voir dire, and it's -- I'm also concerned what this email text says about what else she talked to her father about.

Your Honor can, I think, fairly say, Mr. Sheasby, I don't think this is a violation of my rule by just

telling her father that she's on a case with Mr. Gillam. Once again, that's an abuse of discretion standard for you to make. It's not for me to make. I've not tried 140 cases, but it strikes me that this is just -- the problem is, I don't know what else there is. And in light of the fact that I don't know what else there is, I don't know what other communications she's had with her father. I don't know what her father communicated back to her. I don't know if she was aware this text message was going to the father. It opens up a can of worms.

01:00:08

Now, in the Fifth Circuit in U.S. versus Jones, the standard is an evidentiary hearing to sort of probe that issue. That strikes me as extremely excessive.

We have six jurors without her that can deliver a verdict. What I would request is a deeply practical solution. We make an alternate. If someone has to drop out, we still have six. But in my time here, I've never seen a juror have to drop out during deliberations. And so I would ask that discretion be the better part of valor in this situation, Your Honor.

01:00:42

At a minimum, if Your Honor would not be inclined to do that, I would request that you voir dire her and emphasize to her that in no way can her relationship with Mr. Gillam have -- or her father's relationship with Mr. Gillam have any -- any role in her deliberations in

this case.

And I would request that that be done privately but reported so that she doesn't feel uncomfortable that either counsel -- either side is involved in that engagement. And that's where I am.

But I wanted to emphasize, this is -- I am in your hands. This is a pure abuse of discretion standard. There is a presumption in the Fifth Circuit, but this is -- I'm climbing Everest, and I understand that, Your Honor.

01:01:30 Thank you for letting me be heard.

THE COURT: All right. Is there a response from Defendant?

MR. GILLAM: Yes, Your Honor. Gil Gillam on behalf of Samsung.

The Court will recall how this all arose. I received a text late the afternoon of, I believe, the first day from --

THE COURT: Do you have the text message with you?

MR. GILLAM: I do, Your Honor. I'd be happy to read that into the record.

01:02:00

THE COURT: Please -- please do.

MR. SHEASBY: I actually have it -- a printed out copy.

THE COURT: That's fine. I'll let him read it from his phone.

MR. GILLAM: Actually it would be the second day. I received a text message at 4:59 on Tuesday. It says: Brother Gil, I hope you're well. My daughter tells me she's on your jury. It's her first time, and she is so nervous and intimidated by this. Oh, how I would love for you to scare her some way or just have some fun at her expense. I know you can't and won't, but that's the dark side of me. She, of course, has told me absolutely nothing about the case. I don't even know what it is about. How

01:02:40 is your family? I pray you guys are all doing well. God bless. Tom Webster.

The Court will -- I would like to kind of continue the timeline. That was late in the day on Tuesday. I was not looking at my text during court, but once I did see the text, I immediately went to Ms. Truelove about this, and I showed her the text, and I said we need to approach Your Honor about the text, as well, which we left this -- Mr. Sheasby had already left the courtroom, by the way, at that time.

01:03:11 So Ms. Truelove and I went to your chambers and spoke with you outside the -- outside of the door there.

Your Honor, Ms. Ruiz, during voir dire -- excuse me, specifically said --

THE COURT: Let me stop you, Mr. Gillam.

Once you and Ms. Truelove approached the Court in

chambers, you showed me the text message. And as I recall, you asked me was there anything that you should do?

MR. GILLAM: That's true, Your Honor.

THE COURT: And I gave you instructions not to respond to the text message. And after the trial was over and a verdict was returned and accepted and when the jury had been released, if you wanted to contact Ms. Ruiz's father, you could certainly do that and explain to him why you couldn't return the text during the course of the trial. Were those the instructions I gave you?

01:04:01

MR. GILLAM: Those were the instructions you gave me, Your Honor. And those will be -- excuse me, the instructions that were followed. I have not contacted Dr. Webster about this.

THE COURT: And am I correct that's the only text message you received from him or anyone else during the course of this trial about any member of the jury?

MR. GILLAM: That is the only text message I have received, Your Honor.

01:04:22

THE COURT: Okay. With that addition, go ahead and finish whatever else you had to say.

MR. GILLAM: The only other thing I had to say, Your Honor, was this. Ms. Ruiz, during voir dire, mentioned the fact that I had done a name change for her before. She also mentioned her father was a friend of

mine, as well. And the Plaintiffs decided not to strike her during the -- during the jury selection process.

That was the depth of the questioning done of her.

And so they had the information. And quite frankly, that is the depth of the relationship I have with her is that I did a name change for her and have never seen her since that time.

I would point out, Your Honor, that at least according to the text, she has followed the Court's instruction to the T. When Dr. Webster said she, of course, has told me absolutely nothing about the case, I don't even know what it is about, that is what the Court instructed her to do as well as every other juror here.

And so we don't believe it is necessary to send her to timeout or to make her an alternate or to excuse her for cause or anything of the sort. We believe this is a situation that came up, it was handled as the Court instructed me to handle it, and so we believe that in the Court's discretion, she just should be left on the jury and things should go out as they are.

THE COURT: All right. Thank you.

MR. GILLAM: Thank you, Your Honor.

THE COURT: Anything further, Mr. Sheasby?

MR. SHEASBY: Other than thank you for letting me be heard, Your Honor, no.

THE COURT: All right. Well, with regard to Ms. Ruiz, the Court understands the circumstances. I believe that the factual background of this as outlined by both counsel, particularly Mr. Gillam, is accurate.

To my knowledge and belief, Ms. Ruiz has no idea that this text message was sent. It confirms in my mind that she has scrupulously followed the Court's instructions not to discuss the case with anyone, particularly someone of close family relation like her father.

01:06:27 I am convinced that were I to take her aside, privately or otherwise, and voir dire her on this issue, it would cause more harm than good, and it might -- it might interfere with her ability to be a fair and impartial juror more -- and in a more material way than anything else.

I am going to deny Mr. Sheasby's motion. I am not going to voir dire the juror, and I'm not going to convert her to an alternate position.

She's going to continue to serve as a member of the jury. It's my belief, based on all the evidence I've 01:07:08 seen, she knows nothing about this. And there's been no indication to me that she's done anything but comply with my instructions. And I think any efforts, curative or otherwise, would do more harm than good. So within the Court's broad discretion, the motion is denied.

All right. Those matters having been handled,

we'll turn to the formal charge conference. And I'll handle this in the way that's customary and usual in this Court's practice. And that is I'll ask a spokesperson for Plaintiff and a spokesperson for Defendant to go to the podium.

During the informal charge conference, that was Ms. Baily and Mr. Tezyan --

MR. SHEASBY: Tezyan -- Mr. Tezyan, Your Honor.

THE COURT: And if those are the appropriate persons, if you two lawyers would go to the podium at this time.

01:08:04

And as I indicated to you, we'll begin with the final jury instructions which you received from the Court based upon your earlier submissions and our fulsome discussion during the informal charge conference. We'll review this document on a page-by-page basis so that there is -- as small a possibility as can be that anything will be missed or overlooked.

If at any page there's an item included that you feel is improper, you're free to lodge an objection. If at any page you feel there's a matter that was omitted and should have been included, you're likewise free to lodge any objection.

01:08:33

All right. Turning to the final jury instructions, let me ask counsel, is there any objection

from either party as to anything on Page 1 of the final jury instructions?

MR. TEZYAN: No objection from Plaintiff, Your Honor.

MS. BAILY: No, Your Honor.

THE COURT: Turning then to Page 2, is there any objection here from either party?

MR. TEZYAN: Not for Plaintiff, Your Honor.

MS. BAILY: Not for Defendants.

01:09:04 THE COURT: Next is Page 3, is there any objection here?

MR. TEZYAN: Not for Plaintiffs.

MS. BAILY: Not for Defendants.

THE COURT: Next is Page 4, is there any objection here?

MR. TEZYAN: Not for Plaintiffs.

MS. BAILY: Not for Defendants.

THE COURT: Turning to Page 5, is there any objection here?

01:09:18 MR. TEZYAN: Not for Plaintiffs.

MS. BAILY: Not for Defendants.

THE COURT: Next is Page 6, is there any objection here?

MR. TEZYAN: Not for Plaintiffs.

MS. BAILY: Not for Defendants.

THE COURT: Next is Page 7, is there any objection here?
MR. TEZYAN: Not for Plaintiffs.
MS. BAILY: Not for Defendants.
THE COURT: Next is Page 8, is there any objection here?
MR. TEZYAN: Not for Plaintiffs.
MS. BAILY: Not for Defendants.
THE COURT: Next is Page 9, is there any objection
01:09:40 here?
MR. TEZYAN: Not for Plaintiffs.
MS. BAILY: Not for Defendants.
THE COURT: Next is Page 10, is there any objection here?
MR. TEZYAN: Not for Plaintiffs.
MS. BAILY: I'm sorry, Your Honor. Just on Page 9, I apologize, there's just a word in all caps "Plaintiff." I'm not sure if that was intentional or not.
THE COURT: All right. I've turned back to Page
01:10:10 9. I'm looking for what you're talking about, Ms. Baily.
MS. BAILY: It's in the middle of the page. There's just the word "Plaintiff" is all caps, and I think it was probably a typo.
THE COURT: All right. We'll change that from all caps to comport with the usual practice in reference to the

Plaintiffs.

MS. BAILY: Thank you, Your Honor.

THE COURT: Is there anything else on Page 9 from either party?

MR. TEZYAN: Not for Plaintiffs, Your Honor.

MS. BAILY: Not for Defendants.

THE COURT: All right. Then we'll return to Page 10, is there any objection here from either party?

MR. TEZYAN: Not for Plaintiffs.

01:11:16 MS. BAILY: Not for Defendants.

THE COURT: All right. Turn to Page 11, is there any objection here from either party?

MR. TEZYAN: Not for Plaintiffs.

MS. BAILY: Not for Defendants.

THE COURT: Turning next to Page 12, is there any objection here?

MR. TEZYAN: Not for Plaintiffs.

MS. BAILY: Not for Defendants.

THE COURT: Turn to Page 13, is there any objection here?

01:11:44

MR. TEZYAN: Not for Plaintiffs, Your Honor.

MS. BAILY: Not for Defendants.

THE COURT: Turning then to Page 14, is there any objection here?

MR. TEZYAN: Not for Plaintiffs.

MS. BAILY: Not for Defendants.

THE COURT: Turning to Page 15, is there any objection here?

MR. TEZYAN: Not for Plaintiffs.

MS. BAILY: Not for Defendants.

THE COURT: Turning to Page 16, any objection here?

MR. TEZYAN: Not for Plaintiffs, Your Honor. But in the third line from the bottom, there's an errant bracket included in the sentence that starts with "in making your determination."

01:12:26

THE COURT: All right. I'm aware of that, and I will correct that.

Anything else on Page 16 from either party?

MR. TEZYAN: Not for Plaintiffs.

MS. BAILY: Not for Defendants.

THE COURT: Turn then, if you will, to Page 17, are there any objections here?

MR. TEZYAN: Not for Plaintiffs, Your Honor.

01:12:45

MS. BAILY: Your Honor, for Defendants, with respect to the doctrine of equivalents instruction, we would just request that an instruction be given to tell the jury for which patent claims they may consider the doctrine of equivalents. We made our record on the DOE issues at the Rule 50(a) hearing, so I won't reprise those here. We

understand our Rule 50(a) motions were denied, including with respect to the '164 patent claims.

But separate from that ruling and in view of it, we think at least the jury should be informed here which patent claims the DOE instruction applies to.

THE COURT: And specifically where on Page 17 would you suggest such an addition be made, and specifically what would you suggest be added, Ms. Baily?

MS. BAILY: You could do it in the first sentence of the paragraph, so if you do not find that each limitation of the claim is literally met -- sorry -- apologies, Your Honor.

01:13:46

THE COURT: And could you speak a little louder or pull the microphone closer, Ms. Baily?

MS. BAILY: Yes, Your Honor. If you do not find that each limitation of the claim is literary met, then for certain elements of Claims 1, 5, 6, and 9 of the '164 patent and 1, 2, and 9 of the '223 patent, you may still find infringement.

01:14:52

THE COURT: All right. What's Plaintiffs' counsel say to that suggestion?

MR. TEZYAN: Your Honor, I think that that would invite more confusion to the jury. The certain claims language is -- I'm sorry, the certain limitations language Ms. Baily proposed is ambiguous. It doesn't track which

limitations in the record the doctrine of equivalents was asserted against. And I would just submit that the current language sufficiently instructs the jury on what the doctrine of equivalents is. And the jury heard testimony about particular limitations for the doctrine of equivalents.

THE COURT: All right. In regard to this objection, the Court's going to make the following change to the last full paragraph on the bottom of Page 17. It now reads: If you do not find that each limitation of a claim is literary met, then you may still find infringement.

01:15:53

I'm going to change that beginning phrase of that sentence to say: If you do not find that each limitation of a claim is literally met, then as to the asserted claims of the '164 and the '223 patent, you may still find infringement.

I'm not going to call out the claims individually, but I will call out those two asserted patents because I believe the DOE has been offered as to all the asserted claims of those two patents.

01:16:21

MS. BAILY: Thank you, Your Honor. For the record, we'll just maintain the objection, but we understand Your Honor's change and appreciate it.

THE COURT: You don't think it's adequate to

identify the two patents even though each of the claims you've asserted in those two patents are subject to the doctrine of equivalents argument?

MS. BAILY: It's relevant just, Your Honor, that you can't apply the doctrine of equivalents argument to all of the elements of those claims. That's only been asserted with respect to certain elements of those claims. That's all.

THE COURT: All right. Well, no good deed goes
01:16:57 unpunished, Ms. Baily. That will be the Court's order.

All right. I take it there's nothing else on Page 17, counsel?

MR. TEZYAN: Not for Plaintiffs.

THE COURT: Can we now turn to Page 18?

MR. TEZYAN: Yes, Your Honor.

MS. BAILY: Yes, Your Honor.

THE COURT: Let me ask if there's any objection here from either party?

MR. TEZYAN: Not from Plaintiff.

01:17:15 MS. BAILY: Not for Defendants.

THE COURT: Turning to Page 19, are there any objections here?

MR. TEZYAN: Yes, Your Honor.

THE COURT: State your objection.

MR. TEZYAN: Plaintiffs object to the fact that

the '389 patent is not included in the willfulness charge to the jury.

THE COURT: Well, as you're aware, the Court has granted JMOL on any damages relating to the '389 patent. If there were a finding of infringement and if it were found to be willful, there would be no damages to enhance. It seems to be a moot exercise or a futile exercise to inquire as to willfulness when the result of any possible willfulness finding would be to afford the Court the option 01:18:07 to enhance damages given that there will be no damages awarded on this verdict as to that patent by this jury. So I'm going to overrule your objection.

MR. TEZYAN: Understood, Your Honor.

THE COURT: Are there any other objections from either party on Page 19?

MR. TEZYAN: Not for Plaintiffs.

MS. BAILY: Not for Defendants.

THE COURT: We'll turn then to Page 20. Is there any objection here from either party?

01:18:31 MR. TEZYAN: Not for Plaintiffs.

MS. BAILY: Not for Defendants.

THE COURT: Turning next to Page 21, is there objection here?

MR. TEZYAN: Yes, Your Honor.

THE COURT: State your objection.

MR. TEZYAN: Plaintiffs object to the fact that this page does not include the proposed system art language. And -- system art is part of this case, and the jury needs to be told of the relevant standard for evaluating system prior art.

THE COURT: All right. This was discussed at length in the informal charge conference. The Court overrules the objection and will not make that instruction.

Anything further from either party on Page 21?

01:19:16 MR. TEZYAN: Yes, Your Honor.

THE COURT: All right. Go ahead.

MR. TEZYAN: Plaintiffs object to the language: Prior art also includes the general knowledge or use of an invention by a person of ordinary skill in the art in the United States at the time of the invention.

And the objection is it's contrary to law because it implies that knowledge of a person of skill alone is prior art.

THE COURT: Well, the next sentence goes on to say 01:19:44 that knowledge must be publicly assessable, and it must be sufficient to enable one with ordinary skill in the art to practice the invention.

We discussed this in the informal charge conference. The first sentence alone was objected to, and I indicated that I would add the additional clarifying

sentences to follow. And that's what I've done. But if you'd like to object, I'll be happy to overrule your objection.

MR. TEZYAN: Thank you, Your Honor.

THE COURT: Anything further from either party on Page 21?

MR. TEZYAN: Not for Plaintiffs.

MS. BAILY: Your Honor, two lines up from the bottom of Page 21 is another issue that we did discuss in chambers. And so just for the record, Defendants object to the inclusion of the language, quote, as arranged in the claim, quote. We object to telling the jury that a single piece of prior art that contains all of the elements of the patent cannot anticipate unless those elements are arranged in some particular way. And so we request that that language be struck from the instruction.

01:20:22

THE COURT: All right. That objection is overruled.

Anything else on Page 21?

MR. TEZYAN: Not for Plaintiffs.

01:20:51

MS. BAILY: Not for Defendants, Your Honor.

THE COURT: Then let's turn to Page 22 of the final jury instructions. Are there any objections here from either party?

MR. TEZYAN: Not for Plaintiffs.

MS. BAILY: Not for Defendants.

THE COURT: Next is Page 23, are there any objections here?

MR. TEZYAN: No, not for Plaintiffs.

MS. BAILY: Not for Defendants.

THE COURT: Next is Page 24, are there any objections here?

MR. TEZYAN: Not for Plaintiffs.

MS. BAILY: Not for Defendants.

01:21:16 THE COURT: Next is Page 25, are there any objections here?

MR. TEZYAN: Not for Plaintiffs.

MS. BAILY: Not for Defendants.

THE COURT: Next is Page 26, are there any objections here?

MR. TEZYAN: Not for Plaintiffs.

MS. BAILY: Not for Defendants.

THE COURT: Next is Page 27, are there any objections here?

01:21:33 MR. TEZYAN: No objection, Your Honor, but just to point out that the Defendant is in all caps in that last sentence of the first paragraph there.

THE COURT: I see that, and that'll be corrected.

MR. TEZYAN: Thank you, Your Honor.

THE COURT: Thank you.

Anything from either party on Page 27 otherwise?

MR. TEZYAN: Not for Plaintiffs.

MS. BAILY: Not for Defendants.

THE COURT: Turn then to Page 28, is there any objection here?

MR. TEZYAN: Yes, Your Honor.

THE COURT: State your objection.

MR. TEZYAN: So at the bottom of Page 28, Plaintiffs object to not including the '389 patent here for the reasons we discussed, including that it's -- it's -- I'm sorry, the objection is the -- to the sentence that starts with "as I instructed you earlier in the trial, I have determined that it is not proper for you to award money damages to the Plaintiffs in regard to the '389 patent, and you are not being asked to consider damages as to the '389 patent.

01:22:12

And so the objection --

THE COURT: What's your objection as to that language?

01:22:42

MR. TEZYAN: The objection here is that it's redundant in light of the Court's prior instruction to the jury.

THE COURT: All right. Your redundancy objection is overruled.

Anything else from either party on Page 28?

MR. TEZYAN: No, Your Honor.
MS. BAILY: Not for Defendants.
THE COURT: Turn then, if you will, to Page 29. Is there any objection -- are there any objections here?
MR. TEZYAN: Not for Plaintiffs.
MS. BAILY: Not for Defendants.
THE COURT: Next then is Page 30, are there any objections here?
MR. TEZYAN: Not for Plaintiffs.
01:23:12 MS. BAILY: Not for Defendants.
THE COURT: Turn then to Page 31 of the final jury instructions. Are there objections here from either party?
MR. TEZYAN: Not for Plaintiffs.
MS. BAILY: Not for Defendants.
THE COURT: Next is Page 32, are there any objections here?
MR. TEZYAN: Not for Plaintiffs.
MS. BAILY: Not for Defendants.
THE COURT: Next is Page 33, which begins "a 01:23:34 recitation of the Georgia-Pacific factors," which carries on to the middle of Page 34. Do both parties agree that it's appropriate in this case for the Court to charge this jury on all 15 Georgia-Pacific factors?
MR. TEZYAN: Yes, Your Honor.
MS. BAILY: Yes, Your Honor.

THE COURT: Are there any objections on Page 33?

MR. TEZYAN: No, Your Honor, not for Plaintiffs.

MS. BAILY: Not for Defendants.

THE COURT: Are there any objections on Page 34.

MR. TEZYAN: Not for Plaintiffs.

A. Not for Defendants.

THE COURT: We'll turn then to Page 35, are there any objections here?

MR. TEZYAN: Not for Plaintiffs.

01:24:07 MS. BAILY: Not for Defendants.

THE COURT: Next is Page 36, are there any objections here?

MR. TEZYAN: Not for Plaintiffs.

MS. BAILY: Not for Defendants.

THE COURT: All right. Next is Page 37, are there any objections there?

MR. TEZYAN: Not for Plaintiffs.

MS. BAILY: Not for Defendants.

THE COURT: Next is Page 38, any objections there?

01:24:24 MR. TEZYAN: Not for Plaintiffs.

MS. BAILY: Not for Defendants.

THE COURT: All right. Next is Page 39, any objections here?

MR. TEZYAN: Not for Plaintiffs.

MS. BAILY: Not for Defendants.

THE COURT: All right. Any objections on the partial Page 40?

MR. TEZYAN: Not for Plaintiffs.

MS. BAILY: Not for Defendants.

THE COURT: All right. That concludes the formal charge conference with regard to the final jury instructions.

Let's turn next to the verdict form, which has been prepared and furnished to counsel in the same manner

01:24:58

and under the same circumstances as the final jury instructions. We'll approach it in the same way.

Turning to the verdict form and looking at the cover sheet or Page 1, are there any objections here from either party?

MR. TEZYAN: Not for Plaintiffs.

MS. BAILY: Not for Defendants.

THE COURT: Turning to Page 2 where various definitions are set forth, are there any objections here from either party?

01:25:20

MR. TEZYAN: Not for Plaintiffs.

MS. BAILY: Not for Defendants.

THE COURT: Next is Page 3 where certain instructions are provided to the jury, are there any objections here?

MR. TEZYAN: Not for Plaintiffs.

MS. BAILY: Not for Defendants.

THE COURT: Turning to Page 4 where Question 1 regarding the issue of infringement is found, are there objections here from either party?

MR. TEZYAN: Not for Plaintiffs.

MS. BAILY: Your Honor, we did discuss this in chambers, but just for the record, for the specific reasons we stated earlier during the Rule 50(a) hearing, we think it's improper for the jury to consider the doctrine of equivalents on the asserted '164 patent claims.

01:25:52

For that reason, we have requested that the verdict form separate out literal infringement and infringement under the doctrine of equivalents. Otherwise, we won't be able to adequately preserve our appellate rights with respect to the '164 doctrine of equivalents issue because we won't know whether the jury credited the doctrine of equivalents approach or not if there's a finding of infringement of the '164 patent claims.

THE COURT: That objection is overruled.

01:26:23

We'll turn to Page 5 which contains additional instructions to the jury. Are there any objections from either party as to Page 5 of the verdict form.

MR. TEZYAN: No, Your Honor.

MS. BAILY: No, Your Honor.

THE COURT: Next is Page 6 of the verdict form

where Question 2 is found regarding the issue of invalidity. Are there any objections here?

MR. TEZYAN: Not for Plaintiffs.

MS. BAILY: Not for Defendants.

THE COURT: Turning then to Page 7 where additional instructions are found together with Question No. 3 regarding willfulness, are there any objections here?

MR. TEZYAN: Not for Plaintiffs.

MS. BAILY: Your Honor, as indicated previously,

01:27:00 Defendants object to one question for willfulness as opposed to separate questions per patent. We will not know which patent or patents the jury found willfully infringed without separate questions which could impact damages.

Also, it would not be appropriate for the jury to find willfulness on the '389 patent, and based on this question in the verdict form, we will not be able to determine if the jury found willfulness on the '389 patent.

THE COURT: That objection is overruled. As discussed with counsel, the Court is persuaded there is no

01:27:34 evidence in this case that any of these patents have been managed, handled, or asserted separately or individually. They have been treated as a group throughout the timeline involved in this litigation, and the Court does not see a reasonable basis to extend the verdict form by making this question patent or claim-specific, but feels it's

appropriate to ask the question as set forth on Page 7 of the verdict form.

The objection is overruled.

All right. Let's turn to Page 8 where there are instructions to the jury and then the first of four questions regarding damages. Are there any objections to anything on Page 8 from either party?

MR. TEZYAN: No, Your Honor.

MS. BAILY: Your Honor, Defendants object to

01:28:23 Question 4. Defendants's theory of damages is a single lump sum based on a comparable licenses. And this format for the damages question is inconsistent with that single lump-sum theory. It makes it difficult for the jury to render a damages award consistent with the single lump-sum theory. Even if jury took our lump sum and divided it among the four patents, there may still be appellate issues related to that approach. So we just renew our request for a single damages question now.

THE COURT: That objection is overruled. The

01:28:56 evidence in this case is that Plaintiff presented its damages theories on a -- a patent-by-patent basis with a number of allegedly infringing units and an applicable rate.

The Defendants chose not to present that with a different rate, leaving the unchallenged number of units at

issue in place. Defendants chose to submit a damages theory on a single lump-sum issue without reference to a unit rate. And I think it would improperly favor the Defendants' damages case to ask the question as a single question. I think it's more appropriate, given the way the Court is asking the infringement and validity question, to have individual questions among the four asserted patents on the damages issue, and Defendants' objection is overruled.

01:30:01 Turning to Page 9, the last two damages questions on the '164 and the '425 patents are set forth. I assume, Ms. Baily, your objection would be the same here?

MS. BAILY: Yes, Your Honor.

THE COURT: And the ruling of the Court is the same.

That'll bring us to Page 10 of the verdict form where additional instructions are found. And then Question 5 is included with regard to whether any royalty awarded is either in the form of a lump sum or a running royalty.

01:30:30 Is there any objection here from either party?

MR. TEZYAN: Yes, Your Honor.

THE COURT: State your objection.

MR. TEZYAN: Plaintiffs object to the '389 not being included in the damages question for all the reasons discussed at the Rule 50(a) conference and in Plaintiffs'

proffers and other briefs on the docket, including Document Nos. 535, 547, and 557.

THE COURT: That objection is overruled.

Any objection here from Defendants?

MS. BAILY: Your Honor, just, again, for preservation, we have similar objections to Question No. 5, just in terms of the fact that the patents are split out and our -- the damages theory we presented as one lump sum, and so similar to the objections that we stated for the previous question.

01:31:12

THE COURT: All right. That objection is overruled.

That brings us to Page 11, which is the final page of the verdict form, calling for the date and signature by the foreperson. Is there any objection here from either party?

MR. TEZYAN: Not for Plaintiffs, Your Honor.

MS. BAILY: Not for Defendants.

THE COURT: All right. Counsel, that completes the formal charge conference. The Court will need a few minutes to make sure that I have seven complete and accurate copies of the final jury instructions in written form to send back to the jury with the one clean copy of the verdict form.

01:31:32

As soon as I am produced those materials and am

ready, I'll return to the bench at which time I expect to bring in the jury, again, with my final instructions to them, followed by counsel's closing arguments.

With that, the Court stands in recess.

COURT SECURITY OFFICER: All rise.

MR. SHEASBY: Thank you, Your Honor.

(Recess.)

COURT SECURITY OFFICER: All rise.

THE COURT: Be seated, please.

01:49:34 Counsel, are the parties prepared to read into the record those items from the list of pre-admitted exhibits that were used during yesterday's portion of the trial?

MS. TRUELOVE: Yes, Your Honor.

THE COURT: Please proceed to do so.

MS. TRUELOVE: Exhibits that were used by Plaintiff during the trial yesterday are the following DX exhibits: 009, 010, 012, 013, 019, 031, 032, 034.

The following JX exhibits: 031, 035, 039, 048, 049, and 059.

01:50:36 And then PX-030.

THE COURT: Any objection from Defendants?

MS. BAILY: No objection, Your Honor.

THE COURT: Do Defendants have a similar list to offer into the record?

MS. BAILY: Yes, Your Honor.

THE COURT: Please proceed.

MS. BAILY: Yesterday during trial, Defendants used DX-09, DX-10, DX-12, DX-13, DX-19, DX-31, DX-32, DX-34, and then JX-31, JX-35, JX-39, JX-48, JX-49, JX-59.

THE COURT: All right. Is there any objection from Plaintiff?

MS. TRUELOVE: No objection, Your Honor.

THE COURT: All right. Thank you, ladies.

Counsel, anticipating that there may be a need to address some confidential information during closing arguments, I've instructed that the monitors in the gallery be turned off. I believe they are off now.

01:51:37

Will that suffice for your purposes with regard to any possible sealing during closing arguments, or do you have different requests?

MR. SHEASBY: Your Honor, thank you for that, and it is sufficient for Plaintiff.

THE COURT: All right.

MR. PAK: Same for Defendants.

01:52:01

THE COURT: Then we'll leave the monitors off in the gallery and let that address any possible sealing issues.

MR. SHEASBY: Your Honor --

THE COURT: Thank you.

MR. SHEASBY: I'm sorry for cutting you off.

THE COURT: Yes.

MR. SHEASBY: I'm going to be using the easel. May I pre-position it since I'll be doing the first close and moving it back after my first close? But just to save time, can I move it forward a little right now?

THE COURT: Let me ask you, are you going to be writing on the easel, or are you just going to use it to prop something up?

MR. SHEASBY: I'm going to be showing a page that

01:52:34 was shown during --

THE COURT: It looks like we're at the back of the pad without any new pages. I was concerned you were going to write on something, and there weren't any clean pages left.

MR. SHEASBY: No, I wasn't going to do it, Your Honor.

THE COURT: Yes, you can use it, and you can pre-position it in the typical place.

MR. SHEASBY: Thank you, Your Honor.

01:52:49 THE COURT: All right. Is there anything from anyone else before I bring in the jury and begin with my final instructions to them?

MR. PAK: No, Your Honor.

THE COURT: Anything additional from Plaintiff?

MR. SHEASBY: My clicker has disappeared, Your

Honor.

THE COURT: That is not my problem.

MR. SHEASBY: It is true, it is not. There's this one up here. Is this mine? Found. Thank you for your indulgence, Your Honor.

THE COURT: All right. One more time, is there anything else from either side before I bring in the jury?

MR. SHEASBY: Nothing for Plaintiff.

MR. PAK: No, Your Honor.

01:53:33 THE COURT: All right. I will state for the record and for the benefit of those in the gallery, as I commonly do at this juncture, that the Court considers its final instructions to the jury and counsels' closing arguments to be the most serious part of an inherently serious process.

Accordingly, ladies and gentlemen, I do not want any interruptions or distractions. I don't want any devices to make any noises of any kind. I don't want any rustling of papers. I don't want some paralegal with three 01:54:05 bankers boxes walking in in the middle of the presentations. I don't want anything that would interfere with the jury's attention on both my instructions to them and counsels' closing arguments.

If there's anything that possibly would do that, you need to do it now before I bring the jury in. Once I

bring the jury in, I expect complete silence and stillness so that any disruptions are avoided.

All right. With that, let's bring in the jury, please, Ms. Crowe.

(Jury in.)

THE COURT: Good afternoon, ladies and gentlemen. Please be seated.

Welcome back.

Ladies and gentlemen of the jury, you've now heard 01:55:14 all the evidence in this case, and I'm now going to instruct you on the law that you must apply. As I mentioned, each of you are going to have your own printed version of these final jury instructions that I'm about to give you orally.

I do this so that you can refer to them during your deliberations if you wish to. I also do this so that you won't feel compelled to take notes but can focus all of your attention on the Court as I give these to you orally.

It's your duty to follow the law as I give it to 01:55:45 you. On the other hand, and as I've said, you, the jury, are the sole judges of the facts in this case.

Do not consider any statement that I have made over the course of the trial or may make in these instructions as an indication that I have any opinion about the facts in this case.

Now, you're about to hear closing arguments from the attorneys for the competing parties. Statements and arguments of the attorneys, ladies and gentlemen, are not evidence, and they are not instructions on the law. They're intended only to assist you, the jury, in understanding the evidence and the parties' competing contentions.

A verdict form has been prepared for you, and you will take this form with you to the jury room during your deliberations. And when you have reached a unanimous agreement as to the answers to the questions in the verdict form, you will have your foreperson fill in the answers to those questions reflecting your unanimous agreements, date the form, sign it, and then advise the Court Security Officer that the jury has reached a verdict.

Answer the questions in the verdict form from the facts as you find them to be. Do not decide who you think should win this case and then answer the questions to reach that result. As I've told you, your answers and your verdict must be unanimous.

Now, in determining whether any facts have been proven in this case, you may, unless otherwise instructed, consider the testimony of all the witnesses, regardless of who may have called them. You may consider any stipulations of the party and all the exhibits received and

admitted into evidence, regardless of who may have introduced those exhibits.

You, the jury -- ladies and gentlemen, you, the jury, are the sole judges of the credibility of all the witnesses and the weight and effect to give to all of the evidence.

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe. You alone are to determine the questions of credibility or truthfulness of the witnesses.

01:57:50

In weighing the testimony of the witnesses, you may consider the witness's manner and demeanor on the witness stand, any feelings or interests they may have in the case, any prejudice or bias about the case that the witness might have, and the consistency or inconsistency of their testimony considered in the light of the circumstances.

Has the witness been contradicted by other evidence? Has he or she made statements at other times in other places contrary to what they said on the witness stand?

01:58:23

You, ladies and gentlemen, must give the testimony of each witness the amount of credibility and weight that you think it deserves.

You must also keep in mind that a simple mistake

does not mean that a witness is not telling the truth. You must consider whether any misstatement was an intentional falsehood or a simple lapse in memory and what significance should be attached to that testimony.

Now, as I previously told you, the attorneys in this case are acting as advocates for their competing parties, and they have a duty to object when they believe evidence is offered that should not be admitted under the rules of the Court.

01:59:06 When the Court sustained an objection to a question addressed to a witness, you must disregard the question entirely. You may draw no inference from its wording or speculate or guess about what the witness would have said if the Court had allowed them to answer the question.

On the other hand, if the objection was overruled, then you must treat the answer to the question just as if no objection had been made.

Now, by allowing the testimony or other evidence 01:59:36 to be introduced over the objection of attorney, the Court in so doing did not indicate any opinion as to the weight or effect of that evidence.

Now, at various times during the trial, it's been necessary for the Court to talk with the attorneys outside of your hearing either here at the bench or by calling a

recess and talking to them while you were outside of the courtroom. This happens during trials because there are things that arise that do not involve the jury. You should not speculate or guess about what was said during such discussions that took place outside of your presence.

Now, there are two types of evidence that you may consider in properly finding the truth as to the facts in this case.

One is direct evidence, such as the testimony of an eyewitness.

02:00:23

The other is indirect or circumstantial evidence, that is, the proof of a chain of circumstances that indicates the existence or nonexistence of certain other facts.

As a general rule, the law makes no distinction between direct evidence or circumstantial evidence but simply requires that you find the facts based on the evidence presented, both direct and circumstantial.

Now, during the course of the trial, you may have been shown documents with some portions of those documents redacted or blacked out. In those situations, you should not guess or speculate about what was redacted or why it was redacted, and you should understand those redactions were approved by the Court in advance of the beginning of the trial.

02:00:54

Also, certain testimony in this case has been presented to you through depositions. A deposition is the sworn recorded answers to questions asked to a witness in advance of the trial. If the witness cannot be present to testify in person or if the witness falls within a category under the rules of procedure that allows them to testify both in person or by deposition, then the witness's testimony may be presented under oath in the form of a deposition.

02:01:43 Before the trial began, the attorneys representing the parties in this case questioned these deposition witnesses under oath. At that time, a court reporter was present and recorded their sworn testimony.

Deposition testimony, ladies and gentlemen, is entitled to the same consideration by you as testimony from a witness given in person in open court from the witness stand.

Accordingly, you should judge the credibility and the importance of deposition testimony to the best of your ability as if the witness had testified before you in open court. 02:02:15

Now, while you should consider only the evidence in this case, you are permitted to draw such reasonable inferences from the testimony and exhibits as you feel are justified in the light of common experience. Said another

way, ladies and gentlemen, you may make deductions and reach conclusions that reason and common sense lead you to draw from the facts that have been established by the testimony and the evidence in this case.

However, you should not base any of your decisions on evidence not presented by the parties during the trial of this case, including your own personal experiences with any of the products that might be at issue in this case.

Now, unless I instruct you otherwise, you may properly determine that the testimony of a single witness is sufficient to prove any fact even if a greater number of witnesses may have testified to the contrary if after considering all the evidence you believe that single witness.

02:03:09

Further, when knowledge of a technical subject matter may be helpful to you, the jury, a person who has special training or experience in that technical field, called an expert witness, is permitted to state his or her opinions on those technical matters to the jury. However, you're not required to accept any of those opinions. As with any other witness, it is solely up to you to decide whether or not to rely on the testimony of the expert witnesses and all the witnesses in this case.

02:03:44

Also, certain exhibits have been shown to you during the trial that were illustrations. We call these

types of exhibits demonstrative exhibits. We often simply call them demonstratives for short.

Demonstrative exhibits are a party's depiction, picture, or model to describe something involved in the trial. If your recollection of the evidence differs from the demonstratives, then you should rely on your recollection of the evidence. Demonstrative exhibits are sometimes called jury aids, and demonstrative exhibits, ladies and gentlemen, are not evidence, but the witness's
02:04:38 testimony concerning a demonstrative exhibit is evidence.

Let me be clear, demonstratives will not be available for you to review during your deliberations.

Now, in any legal action, facts must be proven by a required amount of evidence known as the burden of proof. The burden of proof in this case is on the Plaintiffs for some issues and on the Defendants for other issues. And there are two burdens of proof that you will apply in this case.

They are the preponderance of the evidence and
02:05:11 clear and convincing evidence.

The Plaintiffs in this case, Pictiva Displays International Limited and Key Patent Innovations Limited, which you've heard referred to throughout the trial simply as the Plaintiffs or as Pictiva, have the burden of proving patent infringement by a preponderance of the evidence.

Pictiva also has the burden of proving willful patent infringement by a preponderance of the evidence.

Pictiva also has the burden of proving damages for any patent infringement by a preponderance of the evidence.

A preponderance of the evidence means evidence that persuades you that a claim is more probably true than not true. Sometimes this is talked about as being the greater weight and degree of credible testimony.

Now, the Defendants in this case, Samsung 02:06:09 Electronics Company, Limited and Samsung Electronics America, Inc., which you've heard referred to throughout the trial simply as the Defendants or as Samsung, has the burden of proving invalidity of Pictiva's patent claims by clear and convincing evidence.

Clear and convincing evidence means evidence that produces in your mind an abiding conviction that the truth of a party's factual contentions are highly probable. Although proof to an absolute certainty is not required, the clear and convincing evidence standard requires a 02:06:45 greater degree of persuasion than is necessary for the preponderance of the evidence standard.

If proof establishes in your mind, ladies and gentlemen, an abiding conviction in the truth of the matter, then the clear and convincing evidence standard has been met.

Now, as I previously told you, neither of these two burdens of proof are to be confused with a third and altogether different burden of proof known as beyond a reasonable doubt. That is the burden of proof applied in a criminal case, and it has no application in a civil case such as this. Beyond a reasonable doubt is a higher standard than both the preponderance of the evidence and clear and convincing evidence.

Now, as I did at the beginning of the case, I'll first give you a summary of each side's contentions, and I'll then provide you with detailed instructions on what each side must prove to win on each of its contentions.

02:07:33

As I previously told you, this is an action for patent infringement, and the Plaintiffs, Pictiva, contends that Samsung infringes certain claims of the asserted patents.

Remember, there are five asserted patents in this case. They are United States Patent No. 6,949,389 which you've heard referred to as the '389 patent; United States Patent No. 8,314,547, which you've heard referred to as the '547 patent; United States Patent No. 8,558,223, which you've heard referred to as the '223 patent; United States Patent No. 8,723,164, which you've heard referred to as the '164 patent; and United States Patent No. 11,828,425, which you've heard referred to as the '425 patent.

02:08:11

02:09:20

02:10:01

You've also heard these patents referred to and I may refer to them collectively as the asserted patents or as the patents-in-suit.

Now, the Plaintiffs, Pictiva, contends that the Samsung Defendants infringe the following claims of the asserted patents: Claims 34 and 35 of the '389 patent; Claims 1 and 8 of the '547 patent; Claims 1, 2, and 9 of the '223 patent; Claims 1, 5, 6, and 9 of the '164 patent; and Claim 2 of the '425 patent.

You may hear me refer to these collectively as the asserted claims.

Now, Pictiva contends that Samsung has infringed the asserted claims of the '389 patent, the '223 patent, the '164 patent, and the '425 patent by making, using, selling, or offering for sale OLED products and QD-OLED products within the United States.

Pictiva contends that Samsung has infringed the asserted claims of the '547 patent by making, using, selling, importing, or offering for sale QD-OLED products within the United States. Pictiva has the burden to prove these issues by a preponderance of the evidence.

Pictiva further alleges, ladies and gentlemen, that Samsung's infringement of the asserted claims of the patents-in-suit has been willful. Pictiva contends that it is entitled to money damages in the form of a reasonable

royalty for Samsung's alleged infringement. Pictiva has the burden to prove these issues by a preponderance of the evidence.

Samsung denies that it infringes any of the asserted claims from any of the patents-in-suit. Samsung denies that it makes, uses, offers to sell, sells, or imports any accused product that infringes any of the asserted claims.

Samsung also denies that any asserted infringement was willful.

02:10:57

Samsung denies further that it owes Pictiva no money damages.

Further, Samsung contends that the asserted claims of the patents-in-suit are invalid for lacking novelty, being obvious, and having improper inventorship.

Samsung has the burden to prove invalidity by clear and convincing evidence. Invalidity and infringement are separate and distinct issues. Your job is to decide whether Samsung has infringed the asserted claims and whether those claims are invalid.

02:11:33

If you decide that any asserted claim has been infringed and that same claim is not invalid, then you will need to decide the amount of money damages, if any, to be awarded to Pictiva to compensate it for that infringement you found.

If you decide that there was any infringement and that that infringement was willful, then your decision on willfulness should not affect the amount of any damages award you will make. The Court will take willfulness into account later, if you find it.

Now, before you can decide many of the issues in this case, you'll need to understand the role of the patent claims. The patent claims are the numbered sentences at the end of each patent. The claims are important because 02:12:23 it is the words of the claims that define what the patent covers. The figures and the texts in the rest of the patent provide a description and/or examples of the invention, and they provide a context for the claims. But it is the claims themselves, ladies and gentlemen, that define the breadth of the patent's coverage.

Each claim is effectively treated as if it were a separate patent, and each claim may cover more or cover less than any other claim. Therefore, what a patent covers depends in turn upon what each of its claims covers.

02:12:59 Now, you'll first need to decide what each claim covers in order to decide whether or not there is infringement of the claim and to decide whether or not the claim is invalid.

Now, the law says it's my role to define the terms of the claims, and it's your role to apply my definitions

or constructions to the issues that you are asked to decide.

Accordingly, and as I've explained at the beginning of the case, I have already determined the meaning of certain language from the asserted claims. And I have provided you with these definitions or constructions in your juror notebooks, and you may refer to them throughout your deliberations.

Also, you must accept my definitions or
02:13:45
constructions of these words from the claims as being correct. And it's your job to take these definitions that the Court has supplied and apply them to the issues that you are deciding, including the issues of infringement and invalidity.

And you should disregard any evidence presented during the trial that contradicts or is inconsistent with the constructions or definitions that the Court has given you.

Now, for claim language where I did not give you a
02:14:15
construction or definition, that is, limitations that have not been interpreted or defined by the Court, you are to use and apply the plain and ordinary meaning of that language as understood by one of ordinary skill in the art, which is to say in the field of the technology of the patent at the time of the alleged invention.

Now, the meaning of the words of the patent claims must be the same when deciding both infringement and when deciding invalidity. As I noted, you've been provided with copies of the asserted patents in your juror notebooks, and you may refer to them and anything else in your notebooks throughout your deliberations.

Now, several times in these instructions, I referred to or will refer to as a person of ordinary skill in the field of the invention or a person of ordinary skill in the art. In deciding the level of ordinary skill in the field, you should consider all the evidence introduced at trial, including but not limited to, one, the levels of education and experience of the inventor and other persons actively working in the field; two, the types of problems encountered in the field; three, previous solutions to those problems; four, the rapidity with which innovations are made; and, five, the sophistication of the technology.

The claims are intended to define in words the boundaries of the inventor's rights. Only the claims of the patent can be infringed. Neither the written description nor the drawings of the patent can be infringed. Each of the claims must be considered by you individually.

I'll now explain to you how a claim defines what it covers.

A claim sets forth in words a set of requirements. Each claim sets forth its requirements in a single sentence. If a product satisfies each of these requirements, then it is covered by the claim. And there can be several claims in a patent, and each claim may be narrower or broader than another claim by setting forth more or fewer requirements.

The coverage of a patent is assessed on a claim-by-claim basis. In patent law, the requirements of a 02:16:36 claim are often referred to as the claim elements. They're also referred to as the claim limitations.

When a product meets all the requirements of a claim, the claim is said to cover the product, and the product is said to fall within the scope of the claim. In other words, a claim covers a product where each of the claim elements or limitations is present in that product.

If a product is missing even one limitation or element of a claim, then the product is not covered by the claim. And if the product is not covered by the claim, the 02:17:12 product cannot infringe the claim.

Now, the beginning portion or preamble of a claim often uses the word "comprising." The word "comprising," when used in the preamble of a claim, means including but not limited to, or containing but not limiting to. When comprising is used in the preamble, if you decide that an

accused product includes all the requirements of that claim, that claim is infringed, and this is true even if the accused product contains additional elements.

For example, a claim to a table comprising a tabletop, legs, and glue would be infringed by any table that includes a tabletop, legs, and glue, even if a table contains other structures, such as leaves that would go in the top of the tabletop to expand it or legs that -- or, excuse me, or wheels that might go on the ends of the legs.

02:18:11 Now, this case, ladies and gentlemen, involves two types of patent claims, independent claims and dependent claims.

In this case, Claim 34 of the '389 patent, Claim 1 of the '547 patent, Claim 1 of the '223 patent, and Claim 1 of the '164 patent are independent claims.

Claim 35 of the '389 patent, Claim 8 of the '547 patent, Claims 2 and 9 of the '223 patent, Claims 5, 6, and 9 of the '164 patent, and Claim 2 of the '425 patent are dependent claims.

02:18:53 An independent claim sets forth all the requirements that must be met in order to be covered by that claim. It's not necessary to look at any other claim to determine what an independent claim covers.

On the other hand, a dependent claim does not itself recite all the requirements of the claim, but it

refers to another claim for some of its requirements. In this way, the claim depends from another claim.

A dependent claim incorporates all the requirements of the claim to which it refers, or stated alternatively, from which it depends. The dependent claim then adds its own additional requirements. So to determine what a dependent claim covers, it's necessary to look at both the -- both the dependent claim and any other claim to which it refers or as we say, from which it depends.

02:19:48 A product that meets all the requirements of both the dependent claim and the claim to which it refers or from which it depends is covered by that dependent claim.

I'll now instruct you on infringement in more detail. If a person or a corporation makes, uses, sells, or offers to sell within the United States or imports into the United States what is covered by a patent claim without the patent holder's permission, that person or corporation is said to infringe the patent.

In reaching your decision on infringement, keep in 02:20:25 mind, ladies and gentlemen, that only the claims of a patent can be infringed, and you must compare the asserted claims as I have construed each of them to the accused products to determine whether or not there is infringement. This is the only correct comparison, and you should not compare them to the prior art or to the Plaintiffs' own

products in reaching your decision on infringement.

You should not compare the accused product with any specific example set out in the patent, the prior art, or Pictiva's own products, if any, in reaching your decision on infringement.

In deciding infringement, again, the only correct comparison is between the accused products and the limitations or elements of the claims as the Court has construed them.

02:21:16 You must reach your decision as to each assertion of infringement based on my instructions, the meaning -- about the meaning and scope of the claims, the legal requirements for infringement, and the evidence presented to you by both of the parties over the course of the trial.

I'll now instruct you on the specific rules that you must follow to determine whether the Plaintiffs, Pictiva, have proven that the Samsung Defendants have directly infringed one or more of the patent claims involved in this case.

02:21:51 A patent can be directly infringed even if the alleged direct infringer did not have knowledge of the patent and without the direct infringer knowing that what it did was infringement of the claim.

A patent may also be directly infringed even though the accused direct infringer believed in good faith

that what it did was not infringement of the patent. Infringement does not require proof that a party copied its product from the asserted claims.

Now, you must determine separately for each asserted claim whether or not there is infringement. However, if you find that an independent claim on which other claims depend is not infringed, there cannot be infringement of any dependent claim that refers directly or indirectly to that independent claim.

02:22:42 But on the other hand, if you find that an independent claim has been infringed, you must still decide separately whether the product meets the additional requirements of any claims that depend from the independent claim, that is, whether those claims have also been infringed.

A dependent claim, again, includes all the requirements of any claim to which it refers, plus the additional requirements within the dependent claim itself.

Now, in order to prove direct infringement of a 02:23:16 patent claim, the Plaintiff must show by a preponderance of the evidence that the accused products include each and every limitation of the claim either literally or under the doctrine of equivalents.

In determining whether the accused products directly infringe a patent claim in this case, you must

compare the accused products with each and every one of the requirements or limitations of that claim to determine whether the accused products contain each and every requirement or limitation recited in the claim.

An accused product infringes a claim if it is reasonably capable of satisfying the claim elements even though it may also be capable of non-infringing modes of operation.

A claim requirement is literally present if it
02:24:18
exists in an accused product just as it is described in the claim language either as I have explained or construed that language for you, or if I did not explain it or construe it, as it would have been understood by its plain and ordinary meaning to one of ordinary skill in the art.

If an accused product, ladies and gentlemen, omits any element recited in a claim, then you must find that the product in question does not literally infringe that claim.

So long as an accused product has each and every one of the claim elements, infringement of the claim is
02:24:55
shown, even if the product contains additional features or elements not required by the claims.

In making your determination, you must consider each claim separately.

Now, for the '389 patent, Plaintiffs assert that Defendants infringe Claims 34 and 35 of the '389 patent by

importing into the United States or selling or offering for sale or using within the United States a product that was made outside the United States by a process covered by these claims.

To show infringement in this circumstance, Plaintiff must prove that each of the following is more likely than not: One, Samsung imported into the United States or sold or offered for sale or used within the United States a product that was made outside the United States by a process that includes all the steps of at least one asserted claim of the '389 patent; two, the product was made outside of the United States between September the 27th, 2005 and May the 2nd, 2022; and, three, Samsung imported into the United States or sold, offered for sale, or used within the United States the product between those dates.

It's up to you to use your own judgment, based on the evidence presented during the trial, to decide whether the product was made by the patented process outside the United States.

However, I am instructing you that you should find that the product was not made by -- by the patented process outside the United States if you find that either, A, the product was materially changed by later processes; or, B, the product is only a trivial or non-essential part of

another product.

If you do not find that each limitation or element of a claim is literally met, then as to the asserted claims of the '164 and the '223 patents, you may still find infringement if you find each element is met under the doctrine of equivalents.

If a person makes, uses, sells, or offers to sell within the United States or imports into the United States a product that meets all the elements or limitations of a claim -- excuse me, that does not meet all the elements or limitations of a claim and thus does not literally infringe the claim, there can still be direct infringement if that product or method satisfies the claim under the doctrine of equivalents.

Under the doctrine of equivalents, the accused products infringe a claim if they contain elements or limitations corresponding to each and every element or limitation of the claim that it is equivalent to, even though not literally met by the accused products.

You may find that an accused product is equivalent to an element or limitation of a claim that is not literally met if a person having ordinary skill in the field of the technology of the patent would have considered the differences between them to be insubstantial or would have found that the accused product, one, performs

substantially the same function; two, in substantially the same way; and, three, to achieve substantially the same result as the element or limitation of the claim.

In order for the structure or action to be considered interchangeable, the structure or action must have been known at the time of the alleged infringement to a person having ordinary skill in the field of the technology of the patent. Interchangeability, ladies and gentlemen, at the present time is not sufficient.

02:28:56 Now, in order to prove direct infringement under the doctrine of equivalents, the Plaintiffs, Pictiva, must prove by a preponderance of the evidence that for each claim element or limitation that is not literally present in the accused products, the equivalent of that element or limitation is present.

Pictiva contends that Samsung has willfully infringed the '164 and the '223 patents prior to this lawsuit. Pictiva also contends that Samsung has willfully infringed the '164, the '223, the '547, and the '425 patents after commencement of this lawsuit. 02:29:38

Pictiva has the burden of proving willful infringement by a preponderance of the evidence. You may not determine that infringement was willful just because Samsung knew of the asserted patents and infringed them.

You may find that Samsung willfully infringed if

you find that Samsung deliberately or intentionally infringed the asserted patents.

You may find that Samsung's actions were willful if Samsung acted in reckless or callous disregard of or with indifference to the rights of Pictiva.

A Defendant is indifferent to the rights of another when it proceeds in disregard of a high or excessive danger of infringement that is known to it or that was apparent to a person -- to a reasonable person in that position.

02:30:31

Now, to determine whether Samsung acted willfully, consider all the facts and assess Samsung's knowledge at the time of the challenged conduct. Facts that may be considered include whether or not -- whether or not Samsung reasonably believed that it did not infringe or that the asserted patents were invalid.

You may find that Samsung's actions were deliberate or intentional if Samsung was willfully blind to Pictiva's patent rights.

02:31:07

Now, your determination of willfulness should incorporate the totality of the circumstances based on all the evidence presented during this trial. Willfulness can be established by circumstantial evidence. If you decide that any infringement was willful, again, that decision should not affect or impact any damages award that you

might make. Again, the Court will take willfulness into account later if you find it.

I'll now instruct you about the rules that you must follow in deciding whether or not Samsung has proven that any of the asserted claims from the asserted patents are invalid.

An issued United States patent is accorded a presumption of validity based on the presumption that the United States Patent and Trademark Office, which you've heard referred to during the trial as the PTO or as the Patent Office, acted correctly in issuing the patent. This presumption of validity extends to all issued United States patents.

02:31:58

In order to overcome this presumption, Samsung must establish by clear and convincing evidence that a claim is invalid. Like infringement, ladies and gentlemen, invalidity is determined on a claim-by-claim basis, and you must determine separately for each claim whether that claim is invalid.

02:32:33

If one claim of a patent is invalid, this does not mean that any other claim is necessarily invalid. Claims are construed in the same way for determining infringement as for determining invalidity. And you must apply the claim language consistently and in the same manner for issues of infringement and for issues of invalidity.

In making your determination as to invalidity, you should consider each claim separately.

As I explained to you earlier, a previous device, system, method, publication, or patent that predates the claimed invention is generally called prior art and may include items that were publicly known or have been used or offered for sale or references such as publications or patents that disclose the claimed invention or elements of the claimed invention.

02:33:30 Prior art also includes the general knowledge or use of an invention by a person of ordinary skill in the art in the United States at the time of the invention. That knowledge must be publicly accessible, and it must be sufficient to enable one with ordinary skill in the art to practice the invention.

For prior art to anticipate because it has been used, the use must be accessible to the public. Prior art may be authored or created by anyone.

In evaluating the prior art to determine whether 02:34:07 an invalidity defense has been proven in this case by clear and convincing evidence, you may consider whether that prior art was or was not before the Patent Office.

I'll now instruct you about how to determine whether any of the asserted claims of the patents-in-suit are invalid as being anticipated.

In order for something to be entitled to a patent, ladies and gentlemen, the invention must actually be new, and the inventor must not have lost his or her rights by delaying the filing of an application claiming the invention.

In this case, Samsung contends that the asserted claims are invalid because the claimed inventions are not new. In other words, Samsung contends that the patents are anticipated by the prior art.

02:35:00 Anticipation requires that all of the requirements of a patent claim be disclosed in a single prior art reference as arranged in the claim.

Also, the single prior art reference must disclose all the elements of the claim arranged or combined in the same way as in the claim as the claim has been construed or interpreted by the Court.

Samsung must prove by clear and convincing evidence that an asserted patent claim was anticipated by the prior art reference. Anticipation must be determined on a claim-by-claim basis. 02:35:36

Now, to anticipate the invention, the prior art does not have to use the same words as in the claim, but all the requirements of the claim must have been disclosed either stated expressly or implied to a person having ordinary skill in the art in the technology of the

invention so that looking at that one reference, that person could make and use the claimed invention.

Keep in mind, ladies and gentlemen, that Samsung may not establish anticipation by arguing that the accused products practice the prior art or by comparing the accused products to a prior art reference.

An item of prior art may anticipate without explicitly disclosing a feature of the claimed invention if that missing characteristic is necessarily present or inherent in the single anticipating reference.

02:36:38

In this -- in this case, Samsung contends that each asserted claim is invalid as being obvious in view of the prior art. If you find that an independent claim is invalid, you must separately consider whether any dependent claim or claims that depend from it are also invalid.

However, when considering obviousness, if you find that an independent claim is not obvious, you cannot find that its dependent claims are obvious.

I'll now instruct you on how to determine whether any of the asserted claims of the asserted patents are invalid as being obvious.

02:37:17

Even though an invention may not have been identically disclosed or identically described in a single prior art reference before it was made by an inventor, in order to be patentable, the invention must also not have

been obvious to a person of ordinary skill in the field of the technology of the patent at the time the invention was made.

Samsung has the burden of establishing obviousness by showing by clear and convincing evidence that the claimed invention would have been obvious to persons having ordinary skill in the art at the time the invention was made in the field of the technology of the patent.

In determining whether a claimed invention was 02:38:07 obvious, you must consider the level of ordinary skill in the field that someone would have had at the time the invention was made, the scope and content of the prior art, and any differences between the prior art and the claimed invention. Keep in mind that the existence of each and every element of the claimed invention in the prior art does not necessarily prove obviousness. Most, if not all inventions, rely on the building blocks of prior art.

The skill of the actual inventor is not necessarily relevant because inventors may possess 02:38:43 something that distinguishes them from persons having ordinary skill in the art.

In considering whether the claimed invention was obvious, you must first determine the scope and content of the prior art. The scope and content of the prior art for deciding whether the invention was obvious includes at

least prior art in the same field as the claimed invention. It also includes prior art from different fields that a person of ordinary skill in the art would have considered when trying to solve the problem that is addressed by the invention.

Further, teachings, suggestions, and motivations may also be found within the knowledge of a person of ordinary skill in the art, including inferences and creative steps that a person of ordinary skill in the art would employ. A person of ordinary skill may be able to fit the teachings of multiple pieces of prior art together, like pieces of a puzzle. The person of ordinary skill in the art would have the capability of understanding the scientific and engineering principles applicable to the prior -- to the pertinent art.

In considering whether a claimed invention is obvious, you may, but are not required, to find obviousness if you find that at the time of the claimed invention, there was a reason that would have prompted a person having ordinary skill in the field to combine the known elements in a way that the claimed invention does, taking into account such factors as, one, whether the claimed invention was merely the predictable result of using prior art elements according to their known function; two, whether the claimed invention provides an obvious solution to a

known problem in the relevant field; three, whether the prior art teaches or suggests the desirability of combining elements in the claimed invention; four, whether the prior art teaches away from combining elements in the claimed invention; five, whether it would have been obvious to try the combination of elements in the claimed invention, such as when there is a design need or market pressure to solve a problem, and there are a finite number of identified predictable solutions; and, six, whether the change

02:41:10 resulted more from design incentives or other market forces.

Now, to find the invention obvious, you must find that the prior art provided a person having ordinary skill in the field a reasonable expectation of success. In determining whether the claimed invention was obvious, consider each claim separately. Do not use hindsight. Consider only what was known at the time of the invention. In other words, you should not consider what a person of ordinary skill in the art would know now or what has been

02:41:44 learned from the teachings of the asserted patents.

In making these assessments, you should take into account any objective evidence, sometimes called secondary considerations, that may have existed at the time of the invention and afterwards that may shed light on the obviousness or not of the claimed invention.

The following are possible secondary considerations, but it is up to you to decide whether secondary considerations of non-obviousness exist at all:

1, whether the invention was commercially successful as the result of the merits of the claimed inventions rather than the result of design needs or market pressure, advertising, or similar activities;

2, whether the invention satisfied a long-felt need;

02:42:35 3, whether the inventor proceeded contrary to accepted wisdom in the field;

4, whether others tried but failed to solve the problem solved by the claimed invention;

5, whether others invented the invention at roughly the same time;

6, whether others copied the claimed invention;

7, whether others accepted licenses under the patents-in-suit because of the merits of the claimed invention;

02:43:04 8, whether the claimed invention achieved unexpected results;

9, whether others in the field praised the claimed invention;

10, whether there were changes or related technologies or market needs contemporaneous with the

invention;

And, 11, whether persons having ordinary skill in the art at the time of the invention expressed surprise or disbelief with -- regarding the invention.

Now, these factors are relevant only if there is a connection or a nexus between the factors and what differentiates the claimed invention from the prior art.

Pictiva has the burden of establishing this connection or nexus.

02:43:51 Moreover, even if you conclude that some of the above indicators of objective evidence have been established, those factors should be considered along with all the other evidence in this case in determining whether Samsung has proven that the claimed invention would have been obvious.

Now, in support of obviousness, you may also consider whether others independently invented the claimed invention before or about the same time as the named inventor thought of it. In making these determinations, a 02:44:23 person of ordinary skill uses simple common sense and can rely upon inferences and creative steps that a person of ordinary skill in the art would employ.

Also, Samsung does not need to show that one of ordinary skill would actually have combined the physical structures of two references. One need only combine the

teachings.

Remember, as stated earlier, the prior art is not limited to patents and published materials, but includes the general knowledge that would have been available at the time to one of ordinary skill in the field of the invention.

If you find that Samsung has proven -- proven obviousness of a claim by clear and convincing evidence, then you must find that that claim is invalid.

02:45:12 In this case, the Defendants contend that the '425 patent is invalid because of improper inventorship. A patent is invalid if it fails to meet the requirements that all of the actual inventors and only the actual inventors be named as inventors in the patent. This is known as the inventorship requirement.

Defendants must prove improper inventorship by clear and convincing evidence.

To be an inventor, a person must make a significant contribution to the conception of at least one 02:45:49 or more of the specific claims of the patent. Whether the contribution is significant is measured against the scope of the full invention.

If someone only explains to the actual inventors well-known concepts or the current state of the art, he or she is not an inventor. What is required is some

significant contribution to the invention that is claimed.

Now, persons may be inventors even if they do not make the same type or amount of contribution, and even if they do not contribute to the subject matter of each claim of the patent.

Persons may be joint or co-inventors even though they do not physically work together, but they must have some open line of communication during or at approximately the same time as their inventive effort.

02:46:45 Now, in determining whether -- excuse me, in making the determination whether the asserted patents are invalid for lack of proper inventorship, you must consider the patent in its entirety and any related evidence or testimony. However, testimony alone is insufficient to support a claim of improper inventorship. A claim for improper inventorship must be supported by corroborating evidence. This corroborating evidence includes physical, documentary, or circumstantial evidence or reliable testimony from individuals other than the interested party.

02:47:25 If you find that the Defendants have infringed any of the asserted claims of the '164, the '223, the '547, or the '425 patents, then you must consider what amount of damages, if any, to award to the Plaintiffs.

As I instructed you earlier, ladies and gentlemen, I have determined that it is not proper for you to award

money damages to the Plaintiffs in regard to the '389 patent. And you are not being asked -- you will not be asked to consider damages as to the '389 patent.

However, this does not impact any possible damages that you might award regarding the other four patents in this case.

I'll now instruct you about the measure of damages. By instructing you on damages, I am not suggesting which party should win this case on any issue.

02:48:21 If you find that Samsung has not infringed any valid claim of the patents-in-suit, then Pictiva is not entitled to any patent damages.

Pictiva has the burden to establish the amount of its damages by a preponderance of the evidence. In other words, you should award only those damages that Pictiva has established that it more likely than not suffered as a result of Samsung's infringement.

While Pictiva is not required to prove the amount of its damages with mathematical precision, it must prove them with reasonable certainty. 02:48:57 Pictiva is not entitled to damages that are remote or that are only speculative.

The damages you award, if any, must be adequate to compensate Pictiva for any infringement that you have found. You must not award Pictiva more damages than are adequate to compensate for the infringement. You also must

not include any additional amount for the purpose of punishing Samsung or for the purpose of setting an example.

I'll now instruct you on how to calculate reasonable royalty damages.

A royalty, ladies and gentlemen, is a payment made to a patent holder in exchange for the right to make, use, or sell the claimed invention.

A reasonable royalty is the amount of royalty payment that a patent holder and the alleged infringer would have agreed to in a hypothetical negotiation taking place at a time prior to -- prior to when the infringement first began.

02:49:51

In considering this hypothetical negotiation, you should focus on what the expectations of the patent holder and the alleged infringer would have been had they entered into an agreement at that time, and had they acted reasonably in their negotiations.

In determining this, you must assume both parties believed the patents were valid and infringed and that both parties were willing to enter into an agreement. The reasonable royalty you determine must be a royalty that would have resulted from the hypothetical negotiation and not simply a royalty that either party would have preferred. Evidence of things that happened after the infringement first began can be considered in evaluating

02:50:23

the reasonable royalty only to the extent that the evidence aids in assessing what royalty would have resulted from a hypothetical negotiation.

Although evidence of the actual profits of an alleged infringer -- although -- although evidence of the actual profits an alleged infringer made may be used to determine the anticipated profits at the time of the hypothetical negotiation, the royalty may not be limited or increased based on the actual profits the alleged infringer made.

02:51:19

The law requires that any royalty awarded to Pictiva corresponds to the value of the alleged inventions within the accused products as distinct from the other unpatented features of the accused products. This is particularly true where the accused products have multiple features and multiple components not covered by the patents or whether -- or where the accused products work in conjunction with other non-patented items.

If the unpatented features contribute to the accused products, you must apportion that value to exclude any value attributable to unpatented features. You must determine an appropriate royalty that reflects the amount attributable to the patented invention alone.

02:51:57

A reasonable royalty is the amount of royalty payment that a patent holder and the alleged infringer

would have agreed to in a hypothetical negotiation taking place at a time immediately prior to when infringement first began.

You have heard references throughout this trial as to whether Pictiva should be entitled to a running royalty or to a lump-sum royalty. If you find that Pictiva is entitled to damages, you must then decide whether the parties would have agreed to a running royalty or to a fully paid-up lump-sum royalty at the time of the hypothetical negotiation.

02:52:49

A running royalty is a fee paid for the right to use the patent that is -- that is paid for each unit of the infringing products that have been sold. If there are additional units sold in the future, any damages for these sales will not be addressed by you but may be addressed by the Court.

If you decide that a running royalty is appropriate, then the damages you award, if any, should reflect the total amount necessary to compensate Pictiva for Samsung's past infringement.

02:53:21

However, a lump-sum royalty is where the infringer pays a single price for a license covering both past and future infringing sales.

If you decide that a lump sum is appropriate, then the damages you award, if any, should reflect the total

amount necessary to compensate Pictiva for Samsung's past and future infringement.

In considering the hypothetical negotiation, you should focus on what the expectations of the patent holder and the alleged infringer would have been had they entered into an agreement at that time and had they acted reasonably in their negotiations.

In determining this, you must assume that both parties believe the asserted claims were valid and infringed and that both parties were willing to enter into an agreement. The reasonable royalty you determine must be a royalty that would have resulted from the hypothetical negotiation and not simply a royalty that either party would have preferred.

02:54:08

The law requires that any damages awarded to Pictiva correspond to the value of the alleged invention within the accused products as distinct from other unpatented features of the accused products or other factors such as marketing or advertising or Samsung's size or market position. This is particularly true where the accused products have multiple features and multiple components not covered by the patent or where the accused products work in conjunction with other non-patented items.

02:54:44

Therefore, the amount you find as damages must be based on the value attributable to the patented technology

alone.

In determining the reasonable royalty, you should consider all the facts known and available to the parties at the time the infringement began. Some of the kinds of factors that you may consider in making your determination are as follows:

1, the royalties received by the patentee for the licensing of the patents-in-suit proving or tending to prove an established royalty;

02:55:34 2, the rates paid by the licensee for the use of other patents comparable to the patents-in-suit, comparable licensing agreements include those covering the use of the claimed invention or similar technology;

3, the nature and scope of the license as exclusive or non-exclusive or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold;

4, the licensor's established policy and marketing program to maintain its patent exclusivity by not licensing 02:56:13 others to use the invention or by granting licenses under special conditions designed to preserve that exclusivity;

5, the commercial relationship between the licensor and licensee, such as whether they are competitors in the same territory, in the same line of business;

6, the effect of selling the patented specialty in

promoting sales of other products of the licensee, the existing value of the invention to the licensor as a generator of sales of his non-patented items, and the extent of such derivative or convoyed sales;

7, the duration of the patent and the term of the license;

8, the established profitability of the product made under the patents, its commercial success, and its current popularity;

02:57:06 9, the utility and advantages of the patented property over the old modes or devices, if any, that have been used for working out similar results;

10, the nature of the patented invention, the character of the commercial embodiment of it as owned and produced by the licensor, and the benefits to those who have used the invention;

11, the extent to which the infringer has made use of the invention and any evidence probative of the value of that use;

02:57:39 12, the portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions;

13, the portion of the realizable profits that should be credited to the invention as distinguished from

non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer;

14, the opinion and testimony of qualified experts;

And, 15, the amount that a licensor, such as the patentee, and a licensee, such as the infringer, would have agreed upon at the time the infringement began if both had been trying reasonably and voluntarily to reach an agreement, that is, the amount which a prudent licensee who desired as a business proposition to obtain a license to the patented invention would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable to a prudent patentee who was willing to grant a license.

You may have heard these factors referred to during the trial as the Georgia-Pacific factors. No one factor is dispositive, ladies and gentlemen, and you can and should consider all the evidence that's been presented to you in this case on each of these factors, and you may also consider any other factors which in your mind would have increased or decreased the royalty the alleged infringer would have been willing to pay and the patent owner would have been willing to accept acting as normally prudent business people.

When determining a royalty amount, you may consider evidence concerning the amounts that other parties have paid for the rights to the patent in question or for rights to similar technologies.

Comparable license agreements are one factor but only one that may, in the appropriate case, inform your decision as to the proper amount and form of the reasonable royalty award, similar to the way in which the value of a house is determined relative to comparable houses sold in

02:59:57 the same neighborhood.

Such licenses may indicate a patented invention's economic value in the marketplace, and they may indicate the proper form of the royalty structure, such as a lump sum or a running royalty.

A party is not required to use or practice or to have intended to use or practice patent rights in a license agreement for it to be a comparable license agreement. A license agreement need not be perfectly comparable to a hypothetical license that would be negotiated between the

03:00:34 patent owner and the alleged infringer in order for you to consider it.

However, if you choose to rely upon evidence from any other license agreements, you must account for any differences between those licenses and the hypothetically negotiated license in terms of the technology and economic

circumstances of the contracting parties when you make your reasonable royalty determination.

In determining a reasonable royalty, you may also consider whether Samsung had commercially acceptable non-infringing alternatives to taking a license from Pictiva that were available at the time of the hypothetical negotiation and whether that would have affected the reasonable royalty the parties would have agreed upon.

A non-infringing alternative is a way of providing the same or comparable functionality or achieving the same or comparable result that does not require using the asserted claims. You may compare the patented invention to non-infringing alternatives to determine the value of the patented invention, including the utility and advantages of the patent over the old modes or devices, if any, that have been used to achieve similar results.

In calculating damages, you must consider whether or not Pictiva or its licensees marked the products that practice the '547 and the '425 patents by placing on or within those products the word "patent" or PAT, period, or the '547 and the '425 patent numbers.

If you find Pictiva or its licensees failed to properly mark their respective products, then you may only award damages to Pictiva for infringement that occurred after the date Pictiva gave actual notice to Samsung that

Pictiva believed Samsung was infringing the '547 and the '425 patents. It will be up to you to determine -- to determine when such notice occurred.

Now, you may only award damages to Pictiva for infringement that occurred during the damages period. The damages period for the '223 and the '164 patents began on August the 17th, 2021.

Regarding the '547 patent, the damages period begins on October the 19th, 2023, unless you find that Plaintiffs have shown by a preponderance of the evidence that OSRAM and LG Display did not practice the '547 patent in their respective products in which case the damages period for the '547 patent begins in March of 2022.

Regarding the '425 patent, the damages period begins on March the 1st, 2024, unless you find that Plaintiffs have shown by a preponderance of the evidence that OSRAM and LG Display did not practice the '425 patent, in which case the damages period for the '425 patent begins on November the 28th, 2023.

Now, with those instructions, ladies and gentlemen, we'll proceed to hear closing arguments for the attorneys for the competing parties.

The Plaintiff may present its first closing argument to the jury.

Would you like a warning on your time,

Mr. Sheasby?

MR. SHEASBY: I would, Your Honor. With Your Honor's permission, I would like a warning when 10 minutes have been used and when 13 minutes have been used.

THE COURT: I'll give you those warnings. You may proceed with Plaintiffs' first closing argument.

MR. SHEASBY: Good late afternoon, ladies and gentlemen of the jury. I want to begin where I began, in thanking you for your service. These last five days have

03:04:36

been brutal. We understand what a sacrifice this has been for you to spend the time here listening to these issues.

But I hope after the end of these five days you can begin to understand how incredibly important this case and this proceeding is to Pictiva and its partner in this matter, OSRAM.

What is on this flip chart is the vast scope of infringement that has been established in our mind by the preponderance of the evidence in this case. It's over a hundred million units. And those patents infringe -- those

03:05:39

units infringe these five patents, and these five patents go to some of the most fundamental issues in televisions and smartphone devices, battery life, display quality, the ability to make thin film thin, efficient, high-quality displays.

That is what OSRAM created.

And the record showed that OSRAM poured in an extraordinary amount of resources into this program. Dr. Quinlan -- and I'd like Dr. Quinlan to stand right now.

Thank you, Dr. Quinlan. You can sit.

Spoke to you at length about the history of the innovation of OSRAM, spoke to you about the fact that over a period of years, from 1995, 2011, to 2018, they were pouring hundreds of millions of dollars into their research program at OLED, over $400 million. And they continued that research program.

03:06:41

And that research program has been recognized. It's been recognized by one of the most prominent OLED manufacturers in the world.

Now, there was some suggestion that OSRAM's technology, the $400 million it spent innovating, the $400 million that resulted in the United States Patent Office recognizing the novelty and importance of our inventions is not worth anything.

But LG Display, who makes the displays in smartphones, in advanced televisions, in smartwatches, saw the exact same patent charts for three of the five patents at issue in this case, and they chose to comply with the law by taking a license.

03:07:16

This is the timeline of the interactions between Samsung and Pictiva. And I want to focus on two points in

time. I want to focus on December of 2020, and I want us to focus on February of 2021. That was over three years before the initiation of this lawsuit.

Now, one of the things that the Court has said is that what I say is not evidence. And one of the things I'm going to try to do through my presentation is to point you to the actual evidence in this case. And those are the little yellow boxes that are in the bottom of the screen. And if you want to see this evidence in your deliberations, you can ask for it, and you can see it. And why is this so critical? Why is looking at PX-1 and PX-2 so essential?

03:08:17

Well, the reason is because in PX-1 and PX-2, you will see the claim charts that were presented to Samsung three years before this lawsuit was filed on the patents that are at issue in this case.

PX-1, the claim chart for the '389 patent.

PX-2, the claim chart for the '223 patent in which we actually marched through using technical analysis showing where each element of the claim was met. PX-2, again, the '164 patent, where we marched through and show element-by-element where each element of the claims were met using technical analysis.

03:09:06

Why does that matter? It matters because words and deeds tell something very important.

We presented these claim charts to Samsung three

years before this lawsuit was filed. You heard testimony from an immense number of Samsung witnesses, an immense number. And you did not hear one line of testimony in which a Samsung witness disputed or testified that they disputed the infringement or validity of these patents. Not one. For three years, having these charts, and they remained silent. Silence speaks volumes.

One of the things that Samsung did in this case, I respectfully submit, is try to talk about everything other than what really mattered in this case. And if you remember in the opening, they were saying we're going to bring this important OSRAM executive to you. His name is Homer Antoniadis. In fact, of all the witnesses that they paid to testify in this case, Dr. Miller, Dr. Katona, Dr. Kymissis, Homer Antoniadis, only one of them has ever designed commercial OLED devices.

03:10:32

And do you know what he had to say after being paid $500 an hour about whether the OSRAM patents were infringed, valid, and technically beneficial? The only three issues in this case, he had nothing to say about it.

03:11:19

They paid someone $500 an hour to come and talk to you about irrelevant facts distracting from what really matters. You see what they tried to do there? They wanted to talk about research that Dr. Antoniadis did in 2005, but the patents in four of the five cases were invented and

filed after he was even there.

Look carefully at the tactics that were used to distract from the fundamental issues in this case.

The issue that matters are infringement on which we bear the burden. And the first patent that I'm going to speak about is the '547 patent.

Now, to be clear, we asserted that there are multiple claims of the '547 patent that are infringed. But for Samsung to be liable for infringement of this patent, 03:12:23 only one claim needs to be infringed, just one. That's all that needs to be found, one claim.

And you'll see in the design that we presented in 2007, we anticipated the use of dots and small islands that would filter and convert light to create an extraordinary viewing experience.

And in JX-19 at Page 183, you will see the exact same design -- the exact same design that exists on our patent. If people ask you in deliberations, is the '547 patent, is that really about the design that Samsung used, 03:13:15 point them to Figure 3 of the patent, and then point them to Page 183 of JX-19, and ask them -- ask them to explain how the designs are effectively identical.

There is only one answer because the products are infringed.

Here is the claim limitation that I'm going to

speak about. This is Claim 1. Now, Claim 1 is a comprising claim, and the Judge told you something very important about comprising claims. They can do more, and it's not a defense to infringement. They have to have what's listed here.

So, for example, they have to have an organic layer sequence, but if they have more than one organic layer sequence and that does something else than what's in the claims, it's irrelevant to infringement because it's a special comprising claim.

03:14:12

And those are in the Court's instructions. You can read them in the instructions.

So claim requires an organic layer sequence that emits electromagnetic radiation having a first wavelength spectrum during operation.

THE COURT: 10 minutes having used.

MR. SHEASBY: And these are the only devices that we see showing that that limitation has been met. That blue light is emitted from the device, a first wavelength spectrum.

03:14:41

And Youngsoo Kwon has admitted the same exact issue, that blue wavelength has been emitted from the device. And you can look at that at JX-17 at 5.

He's also admitted that the wavelengths are blocked -- blue is blocked by the filter, which, again,

satisfies the element.

The second claim patent I'm going to focus on is the '389 patent. Once again, only one claim needs to be satisfied for infringement.

Here, we speak about at Column 7, 1 through 13 of our patent, the use of selective deposition through a shadow mask or inkjet deposition to achieve the goals of the claim.

And if you go to JX-21 at 12 -- go to JX-21 at 12, 03:15:33 and you will see that Samsung uses that exact same design, inkjet and shadow mask. What's the reason that the exact design in the patent is the exact design they used, launched years after our product? Because the product is infringed. JX-12 -- 21 at 12. What I say is not evidence. What I'm pointing to you is evidence.

Let's go to the '425 now.

The '425 talks about an organic layer sequence that is n-doped. Remember n means electron -- negative -- electrons are negative. And we did testing showing that in 03:16:19 the devices, there is a molecule called Liq. I like calling it Liq, but I'm not supposed to. I'll call it Liq.

It was also shown that in the accused devices, there's a triazine group.

Now, when the triazine group of the Liq comes together, something very special happens. What happens is

that the electron transport layer is n-doped. And there was an article that was written by Samsung's own engineers, Dr. Kang that was funded by Samsung engineers that make clear that Liq, when connected to the triazine group, injects electron characters -- carriers. It satisfies the claim limitation.

The next claim at issue, the '223 patent, it requires joint vaporization of a metal complex. JX-15 at 12, this shows the chamber in which the materials are jointly vaporized. And it's a very specially designed chamber. Dr. Schanze speaks about it.

03:17:20

I'd like Dr. Schanze to stand right now.

Dr. Schanze who has been teaching and analyzing chemistry for 42 years, who is so diligent. Thank you for sitting, Dr. Schanze.

THE COURT: 13 minutes have been used.

MR. SHEASBY: And he explained to you the special nature of this design that allowed for the joint vaporization because the walls between the two chambers were so low they could mix together.

03:17:48

The next claim, the '164 patent, I can't forget Dr. Humphrey -- Mr. Humphrey.

Mr. Humphrey, can you stand, please?

42 years in the real world of designing these.

Thank you, Mr. Humphrey.

And they say there's no functional emission layer. But the trick is that they're adding a limitation to the claim. They're saying that that functional emission layer can't have sublayers, and we have sublayers, but the claim doesn't say you can't have sublayers. They're changing the claims.

This patent specification at 5, 3 through 7, says that several layers can combine together to create the emission layer. 5 at 3 through 7.

03:18:39 JX-6 at Page 163 -- go to JX-6 at Page 163. You see how it says that the combination of REML and R-prime work together to improve charge balance and lifetime. And you see how they're all red. Those two sublayers combined together to create the emission layer. I didn't color that in red. That's in the original document. Their own documents admit the two sublayers combine together to create the emission layer. That is their own evidence.

Show that to your fellow jurors and ask them to explain how those do not create -- REML and R do not create 03:19:30 an emission layer when the documents themselves literally say they do.

In addition, even if it's not literal, it's infringing under the doctrine of equivalents.

The next issue is validity. Validity is not an issue on which I have the burden. But I want to speak

about it because it tells volumes about the credibility of what was presented this week by the Samsung entities.

They had to prove validity by clear and convincing evidence. And what did they do? They brought us a design called Clix2 from 2007 that their witness admitted under oath has never been used in any other product. Think about this. They bragged about the billions of dollars they spent on developing their OLED designs. That's what they said. And at the flip side, they're saying, oh, no we just used the failed Clix2 OLED technology.

03:20:24

That doesn't make sense at all. Let me give you an example of that. In the '425 patent, in the infringing products, they use a triazine group which when combined with Liq, leads to n-doping. We asked their own engineers is the old Clix2 product n-doped? And he said no.

We asked Dr. Katona did he actually analyze whether the old Clix2 product has the triazine group, the special triazine group that the new products had?

And he said: I didn't even analyze it.

03:21:05

Now, let's go on to the '223.

Dr. Schanze spoke about the fact that the manufacturing products for the current design has changed dramatically from the design that existed previously. He speaks about that under oath.

And Dr. Jo -- Mr. Jo admitted that there's no

joint vaporization in the old Samsung Clix2 design.

Dr. Kymissis admitted that the old Clix2 design used the nozzle, and that is different from the old design.

And I want to speak about something very important. They told you that the old design for Clix2 is no different from the new design, but I want -- I want you to be careful. I want you to see what they're doing. They're doing something, trying to flip the burden. They said, oh, we've seen some simulations that show Clix2 is the same as the new product.

03:22:00

But their own witness didn't bring those simulations. If they had evidence to prove by clear and convincing evidence that Clix2 was the same as the current products, that Clix2 did what they said they did, they would have brought that evidence.

See what they're trying to do there? They're trying to flip the burden.

The last issue is damages. Damages are for the use made of the invention.

03:22:25

This is a slide they showed in opening, and in that slide, they wanted to talk to you at length about the negotiations between OSRAM and Pictiva. And the fact -- Dr. Quinlan, they spoke to her for, I think it was, 20 minutes showing her the negotiations back and forth between OSRAM and Pictiva about what would the pricing be for this

partnership. And I'm assuming a lot of you folks thought, well, this must be really important to damages since they're spending so much time on it.

The Judge's instruction the next day was those negotiations between OSRAM and Pictiva are utterly irrelevant to damages.

You see what they tried to do there? They tried to distract you, speaking about something for over 20 minutes with Dr. Quinlan that is utterly irrelevant to any of the issues in this case.

03:23:16

Dr. Schanze and Dr. -- Mr. Kennedy worked together to describe exactly what the technical benefit of these products were. The reasonable royalty numbers were given to you by Dr. -- Mr. Kennedy based solely on the conservative technical analysis.

As you can see, this is not a one-sided deal. They keep $2.7.96 (sic) billion dollars of profits solely for infringement in the hypothetical negotiation.

And what was their response to all of this? It was to bring a witness named Dr. Perryman, who I thought was the nicest man in the world, and I loved his honey voice. And they said that he was an expert in patent licensing. That's what they told you, and that's what they told the Court. And under oath, he said the exact opposite. He's not an expert in patent licensing.

03:23:53

Ladies and gentlemen of the jury, do not be distracted. Focus on what matters. I ask you that with humbleness and with gratefulness.

Thank you.

THE COURT: Put the chart back, please.

Defendants may now present their closing argument to the jury.

Mr. Pak, I understand you and Mr. Gillam are going to share your time?

03:24:59 MR. PAK: Yes, Your Honor. Can I tell you our allocations and ask for time warnings?

THE COURT: That's why I'm asking.

MR. PAK: Thank you.

Your Honor, I've been allocated 28 minutes, and Mr. Gillam will speak to the jury for 12 minutes.

THE COURT: What kind of warnings would you like?

MR. PAK: I would like 10 minutes left and 2 minutes left.

THE COURT: Out of the 28?

03:25:23 MR. PAK: Yes, Your Honor.

THE COURT: And, Mr. Gillam, what would you like?

MR. GILLAM: Your Honor, I would like to know how much time I have left when Mr. Pak actually sits down. But then also two minutes --

THE COURT: Whatever the number is.

MR. GILLAM: Yes, Your Honor, I'd like to know what that is, and then I'd like to have a two-minute warning, please, sir.

THE COURT: All right.

MR. GILLAM: Thank you.

THE COURT: Mr. Pak, you may proceed with Defendants' closing argument.

MR. PAK: Ladies and gentlemen of the jury, I want to thank you with incredible gratitude on behalf of
03:26:01 Mr. John Lavoie, the thousands of employees of Samsung that work here in this country, and the thousands that work across the world.

This case is very important because there's been some serious allegations in this case that we have willfully taken someone else's property to build the great products that we deliver to our consumers worldwide.

And we're here because this is the first time that any factfinder has had the opportunity to look at all of the evidence, including all the prior art that the patent
03:26:33 examiner never got to see, and in the hands of the new owner, Pictiva/KPI how these patents have been stretched to cover technologies and innovations that predate the filing of these patents. That's why we're here. And we trust you to make the right decision.

Opening statements, ladies and gentlemen, are

promises, promises made by each party about what they're going to deliver in terms of evidence.

And this is what was stated by Pictiva in its opening statement. They said that all Samsung would do in this case is offer up excuses -- and they had this sign post here to the right -- without showing you any evidence, without walking you through any claim limitation, without showing you documents.

Now, we've been here for four or five days. And I submit to you respectfully that that is exactly the opposite of what we have done. We have brought you evidence from live witnesses, people who were there at OSRAM. The Samsung engineers who designed the accused products going back to the time before these patents were filed, and we have brought very credible experts.

And I think we just saw it in the opening statement from counsel. We've been inundated, to be honest, with a lot of distractions. And I think if you were to think about the claim language, as His Honor has instructed you, look carefully at His Honor's instructions on how to think about the questions before you, you will find that much of what's been done by Pictiva in this case is to distract you away from the real evidence in this case which show, based on even admissions by their own experts, tests that they conducted that they never showed you, that

the accused products do not meet the requirements of these claims in these later-filed patents, because Samsung is using its own technology.

Samsung's success has been the result of grit, hard work, and a lot of innovation, things that OSRAM, despite their best efforts, did not achieve and had to exit the market.

I want to quickly, before I walk through the evidence for your collective benefit, I want to just talk about a few things that we just heard. For example, we heard about LG. As Your Honor just told you in the instruction on the issue of marking, which is whether they marked every licensed product with a patent number, they have to prove that LG and OSRAM do not practice these five patents. So why do they keep talking about LG and OSRAM as if these five patents were used by them?

Remember, LG took a license for 1,400 patents. And it is their position -- it is Pictiva's position that five of these -- five of those patents that are asserted in this case LG never used it. Otherwise, they couldn't seek past damages for all five patents.

We also heard about commercial OLED experience from our experts. But, again, as you heard from Dr. Homer Antoniadis, OSRAM never used the one patent that he was there for and now the position of Pictiva -- and you've

seen no evidence in this case, that OSRAM ever used the remaining four.

So why are we talking about commercial OLED experience when there's no evidence that anyone's used these five patents? And if you were to just think back the types of experts we brought, chemists. We brought people with 30 years of teaching, research experience on the cutting edge of OLED industry, Dr. Antoniadis, Dr. Kymissis, Dr. Katona, who have been designing OLEDs for U.S. Government on classified projects and teaching for many, many years and publishing and getting patents. To suggest that they're not experts on these patents just because they didn't work for a commercial company, that's a distraction.

03:30:41

You also heard so much about this Kang paper -- Dr. Kang at Samsung Research -- as if that was some type of actual experiment in the real world. But as we found out by looking at that article through our experts, and also I used it in cross-examination with Pictiva's experts, that's a theoretical paper. And what counsel just didn't show you, and you can read it for yourself, is in the conclusion of that paper it says it would weaken the electrical characteristic of these devices if you were to do the n-doping and the coordination bonds between Liq.

03:31:17

Remember I cross-examined Dr. Schanze. I said:

You didn't show us this conclusion. Let's take a look.

And he says: It would weaken -- it would weaken the electrical performance of any product that had these attributes.

So the theoretical paper by Samsung saying don't do the things in these patents, yet this gets brought up over and over again even after the conclusion has been shown to you. Why is that? Because they have no actual data or test to show that these things are happening in the accused products.

03:32:09

On the issue of testing, do you remember how many times they accused our witnesses for not doing testing or bringing simulation data where these destructive tests, these ion bombardment TOF-SIMS tests which can't tell you anything about where these compounds may be located or whether bonds exist because they literally destroy the surface through high energy ions? Yet we heard from Dr. Miller, the chemist, who said I looked at Dr. Schanze's expert reports, and he actually performed an X-ray test, a non-destructive test that conclusively proved that the accused products do not do n-doping, and they do not do coordination bond. Remember that peak, the nitrogen, it didn't move.

03:32:51

Yet how come when they had Dr. Schanze up here, they never showed you that test, the one that he

commissioned on the accused products. Because that test, the only actual experimental test proves that we don't do these things. And it took our case and our expert to bring you that evidence.

So what does it say about the credibility of Pictiva when they're pointing the finger at our witnesses for not showing you irrelevant tests, yet they're sitting there with the most relevant tests and failed to disclose that to you? What does that say about the credibility?

03:33:39 I would suggest it's not only a distraction, but it's something that you should take into account, that Dr. Schanze intentionally left out the most important test in this case that he commissioned on the actual accused products to see if they practiced the patents, and the tests show that they do not.

You ought to wonder why, with plenty of time left, that Pictiva did not put up a single witness in their rebuttal case after we sat down and brought you all these fact witnesses and experts, pointed out the 03:34:12 inconsistencies, brought you all of the available evidence to prove non-infringement, and then when they stretched their claims to cover pre-existing innovations by Samsung that renders their claims invalid, none of the experts were sitting in this room for Pictiva. Dr. Schanze, Mr. Humphrey, they didn't take the stand. They didn't say

you were wrong. Here's some evidence that shows that the patent actually is still being infringed. Dr. Schanze didn't get up here and say, hey, that test, it actually doesn't prove what you say. They didn't take the stand because we're right. It's unrebutted. Everything we brought you is unrebutted.

So what does it say when, again, we hear from counsel about the same distractions that we have seen all along that have nothing to do with the real issues in this

03:35:05

case. I mean, he even put up color circles in a patent after -- Dr. Kymissis, who has been working on Quantum D technology said just because something is a circle does not make it a quantum dot. But, again, what is counsel making you do? Just look at circles rather than trying to understand the testimony of experts.

And if that was truly the case, counsel's arguments to you are not evidence. They should have brought an expert to you in their rebuttal case and say those circles, they're really quantum dots. You never

03:35:41

heard such evidence.

Clix2, how many times did we hear that was a failure after we brought you all the evidence of commercial sales, industry praise, world's first OLED panel device on a mobile instrument of any kind. You saw the praise. You saw the sales. And yet counsel wants you to believe that

it was a complete failure so that we shut down the factory.

I was in this courtroom when they played the video testimony, and I realized that they had chopped off the word "currently" in all those cross-examination questions. The witness testified currently the A1 factory line is closed. That deposition -- you can see it on the timestamp, if you remember, was 2025. And yet counsel is suggesting to all of our witnesses Clix2 was such a failure that Samsung had to shut down the factory. Nothing could be further from the truth. We brought you evidence that we've been operating that factory, producing millions of units for Samsung/Apple until 2017.

03:36:44

And guess what? They're accusing products that go back to 2013. That means that some of the accused products in this case were manufactured in the very A1 factory that counsel wants you to believe was shut down because Clix2 was such a failure.

And that testimony he keeps showing you, of course, we will not use the same panel size that was made for Clix2 which had a particular form factor for other smartphones and other devices that have different sizes and requirements. It doesn't mean that the accused manufactured technology was not used in the A1 factory.

03:37:18

Do you remember when I asked Dr. Schanze on the stand using his deposition testimony: Do you dispute the

testimony of Mr. Jo, the Samsung engineer, the sequential scanning was used in the prior art device manufacturing, Clix2, and is the same manufacturing process that's used in the current factories for the accused products?

He says: I can't dispute that. Samsung engineers know what they're talking about.

So how could they come in here and, again, fill you with distractions?

I submit to you, ladies and gentlemen of the jury, 03:38:18 that there are some broken promises here. Pictiva broke its promises in delivering you real evidence, and we kept ours.

And I want to walk you through some of the evidence from the claim charts and things that they alleged that we will never show you in this case.

Let's talk about the pre-suit. Do you remember the evidence showed that in the top 20 patent list, do you recall that email with Samsung and OSRAM at that time -- or Pictiva at the time? It was Pictiva that had to choose the 03:38:51 top 20 patents to talk about with Samsung, that Samsung was only obligated to respond to the things that Pictiva put in that top 20 list.

Only one out of the five patents in this case was included in that list. That was the '389 patent. And we told them at that time that's an invalid patent. And we

brought you evidence in this case multiple -- five different prior art references that invalidate the '389 patent. That was our case-in-chief.

Did you see any expert get up and say we're wrong about that when we showed you all the planarization layers and barrier layers and shadow mass and selective deposition techniques? Not one word. So they're admitting that the '389 patent is invalid just like we told them back in the day.

03:39:40 And this is the evidence, DX-33. Take a look. That's the email in which both parties agreed that Pictiva would select the top 20. And '389 was the only patent for which they cannot seek damages.

So, again, here's another distraction. Why are we spending time in this case on a patent that they are not even going to contend is valid, on a patent that they're not seeking damages to do what we just saw happen, to willfully accuse us of infringement just because we said your patent is invalid? You know what, you can't get money

03:40:17 on invalid patents. We don't have to tell you every reason why we don't need a license. If we think the patent is invalid, it's invalid. We don't need to talk about that.

We brought you five pieces of prior art that invalidates this patent. Not one expert on their side rebutted that.

These other four, the ones with the other claim charts that they want you to look in that red box, they weren't included in the top 20 list. So Samsung was not obligated to respond with any claim chart analysis.

And you know what, four -- these four weren't even in the top 20 of the patents being under discussion between Samsung, and yet here they are saying they're the most fundamental patents. Common sense tells you that can't be true.

03:41:04 And, again, they have a burden of proving that these five patents were never used by OSRAM, never used by LG, so how could they be fundamental? It means according to them and their burden, LG was making all of these products that you see without using these five patents. And if they really wanted to prove that LG or OSRAM used those patents, they should have given up their claim for past damages on some of these patents, and they should have brought an expert in here to show that LG and OSRAM used these patents. They did nothing of the kind.

03:41:39 I'm just going to walk you briefly through some of the evidence that you've seen on this patent.

Jones, that's JX-35. Invalid. Walked you through the claim limitations, provided expert testimony. No rebuttal, undisputed.

So when you get to that question in the verdict

form, it's uncontested that Lady Justice's scale is tipped a hundred percent to our favor because counsel's arguments are not evidence. If they wanted to rebut that, they should have brought an expert.

Same thing for Ni, JX-34.

Same thing for Burrows, JX-39.

And by the way, Burrows is owned by Samsung Display. This is our patent. It predates theirs. Shows exactly the same structures.

03:42:27 Just going back, Jones, that's another eMagin patent owned by Samsung Display.

Yamazaki, DX-31.

And not only that, when they came to talk to us in those claim charts you'll see for the '389 patent, they said, you are not -- you're selectively depositing because the camera hole, there is a hole in there. That was their claim for selective deposition. Yet what evidence did we bring?

We brought you evidence that we actually covered 03:43:01 up that hole initially because we just blanket our thin film encapsulation structure, we go back and take it out using laser ablation. These are not facts that are disputed by their experts. So they said you selectively deposit it because I see a hole in the camera. We came back in this case with real evidence saying that hole

exists because we blanket covered everything on the front, then we went back and removed it, which is exactly the prior art technique that the patent says is not covered by the invention.

THE COURT: 18 minutes have been used.

MR. PAK: Thank you, Your Honor.

These are some of the distractions we've seen all along. Dr. Katona, you didn't disclose to the ladies and gentlemen of the jury you modified this figure? That's

03:43:54 supposed to suggest somehow we manipulated the figures out of this document that we just saw with the laser ablation? Dr. Katona told you: I think the only thing I modified was blowing up the camera hole. Everybody does that.

Same thing with the allegations against Dr. Antoniadis. Well, he's being paid. Samsung's paid experts. Everybody is being compensated. You've heard that. Every expert who has testified in this case who has other professional commitments have been compensated for their time. And everybody has said we're here, we don't

03:44:29 have a financial interest in the outcome of this case. We're giving you objective expert opinions for the benefit of the jury.

You've heard about His Honor's instruction during the time. And, again, this isn't just something that we're hearing about for the first time now. His Honor instructed

them right after their damages expert testified that you were not to award damages if they are not entitled to damages in the '389 patent.

And if they were not going to challenge the validity of the patent, which turned out to be the case, why did we spend so much time talking about that patent for which they cannot collect damages and it's invalid?

We want to describe something. The verdict form is for you to fill out. I'm not going to fill out the verdict form for you, but there is something about the verdict form that you will see. Question 1 on infringement comes first on every patent. And if you check no, you skip to the next patent. But if you check yes, only then do you consider the question of prior art and invalidity.

So I want to just walk you through the mechanics. We believe that the evidence on non-infringement across the board has been so strong. We brought factual witnesses, experts that they did not rebut in their case. If you check no, you stop.

But if you happen to disagree with us, you check yes, I'll submit to you because they didn't rebut any of our invalidity defenses that are based exactly on their theory of infringement, that the only correct answer is to check yes when it comes to invalidity for us because what we did is provide evidence of prior art devices and patents

that were never considered by the patent examiner that we proved invalidate their patents. And their experts did not take the stand to rebut it. They have nothing to say. So on that scale, there's no evidence to rebut all of the evidence that we brought.

I talked to you about this in the opening. We're here because they're literally moving their property deed to cover patents that we own, products that we built without their patents, and shipped worldwide. When you do

03:46:52 that, just like if a new neighbor were to come in and accuse you of trespassing on your own land, not only does it mean that you don't infringe their property line, but that makes their deed invalid. That's exactly what we're saying here when they accuse technologies that were disclosed in our prior art patents and they accuse technologies that were used in the Clix2 and has been continuously used in all the accused products, things like sequential scanning.

We brought you evidence. Dr. Antoniadis was not

03:47:24 here to talk about infringement and validity. He was to share the real truth about what happened with OSRAM, so you can weigh it and use it however how you see fit.

But importantly, we're also talking about really important innovations that OSRAM at the time thought was too difficult for any company to achieve, things like fine

metal masks, putting transistors inside films, active matrix that allow you to control every pixel one at a time.

That all ended up in Clix2, which was this high-definition video-capable mobile device. That was the result of many decades of hard work, innovation that Samsung engineers did on their own.

All of these witnesses we brought you in our case to make that point that what we achieved and the reason why Samsung Electronics has used their panels in their Galaxy
03:48:25
phones and Apple has decided to use Samsung Display's panels in the iPhone is a result of all of that history of innovation. And we brought you the people who were there, and we brought you the experts to connect the dots for you.

This isn't about damages. We don't think we owe these people anything based on the use of our own technology. But we did want to explain to you that we achieved commercial success starting with the Clix2 based on our own technology that does not utilize. And remember, they cannot accuse Clix2 of using any of these five patents
03:48:59
because Clix2 predates most of them, and they have never asserted the '389 patent against Clix2.

'547 -- I mean, the '425 patent. On the '425 patent, there's a really important defense you'll be asked to answer as to improper inventorship answer -- which question which is when Pictiva filed for the '425 patent in

2023, just shortly before they sued us, they changed the claim scope. Remember the original claim was to cover lighting applications? That's why they had the people from Kiska, the industrial design firm. Yet when they changed the claims and you can -- we did the comparison for you, the original claim to what they filed which leaves out all the lighting limitations, they didn't take away the names of those people from the design shop who only worked on the lighting.

03:49:59 Under the law, you can only have proper inventors. Those people never worked on the OLED diode, which is the lighting mechanism, not the industrial design.

That's a failure to name the right inventors and makes the patent invalid. They didn't have any evidence to rebut that.

Yet we just saw more distraction. We saw counsel for Pictiva ask about, well, what are the inventors that should have been included? But that's the exact opposite of the inventorship defense we're running here. We're not 03:50:35 saying more people should have been added. We're saying you have too many people, and you changed the claim scope to cover things that were never meant to be covered by the invention.

So much time spent on this patent that they're asserting only against the television, the '547. And yet

over and over again in the patent, if you read it, Column 1, Line 11 through 15, it's only about things in lighting applications like camera light bulbs where you want the light bulb or the camera flash to look similar to how it was turned on. That's why they're putting those color filter and the conversion regions side-by-side or lateral, so it doesn't affect the on state.

And even their prototype failed when they tried to use it for a lighting application like the static sign.

03:51:32 THE COURT: 26 minutes have been used.

MR. PAK: Thank you.

And we all know that we don't need it for TVs because those remain off.

And we brought you evidence of vertical stacking.

I want to summarize in the short amount of time I'm here before I turn it over to Mr. Gillam, on these three patents, the most important thing to remember is that sequential scanning, n-doping, no n-doping, no molecular bonding has been the same since Clix2. So -- and we have 03:52:09 brought you evidence over and over again. And I have all those admissions from Dr. Schanze and Mr. Humphrey that the HOMO/LUMO values don't add up, electrons, sequential scanning means you're not doing joint vaporization, all those admissions that I obtained is evidence on our side. And they had the full opportunity to get up here and say

you're wrong. They can't because they provided sworn testimony to you.

03:53:01

So as long as you remember that Clix2 works in exactly the same way for the accused functionality, and I'm not talking about the configuration of nozzles and things, I'm talking about fundamental functionality that's been accused of infringement, there's no dispute now that everything they have accused here for these three patents existed in Clix2 using our own independent development efforts and innovations. So when they accuse the same technology in the current set of products, they're stretching those claims, and that means that there's no infringement.

So I'm not going to review all of that evidence, but I would ask all of to you remember, and if you took notes, to go back and think about the admissions that I obtained in cross-examining their experts.

With that, Your Honor, I'd like to pass it to Mr. Gillam.

03:53:34

THE COURT: I'll give you a two-minute warning before your time ends. I'm calculating how much time you have left right now. You have 12 minutes, counsel.

MR. GILLAM: Well, I guess I owe him dinner, Your Honor.

Ladies and gentlemen, good afternoon. I told you

at the beginning of this case that if I had any concerns, I would share them with you. I have one. After I sit down, Mr. Sheasby is going to have a chance to stand back up and speak to you one more time. That's the way our system works. The Plaintiff gets to go first, Plaintiff gets to go last. We're not going to have a chance to stand up again and respond to what he has to say.

But I'm encouraged by two things. First, as the Judge told you, what he says and what he's going to say is not evidence. You have heard the evidence that Mr. Pak laid out for you as to why Samsung does not infringe. And Mr. Sheasby cannot change those facts.

03:54:35

The second thing is we paid very close attention to you during this trial and saw that you paid very close attention to the evidence in this case, as well. Sometimes very complex and complicated evidence, to be quite honest with you.

So I'm comforted by that, that in your good judgment, you'll do the right thing, no matter what Mr. Sheasby has to say.

03:55:10

Now, this case at its core is about patent infringement. Mr. Pak has already gone over that with you. And I'm going to discuss the issue of damages with you not because Samsung owes one dime. It does not owe any money in this case because Samsung does not infringe these

patents, as we've already described to you.

But I address it because you've heard evidence about it. When you talk about damages, you invariably have to talk about money. And I would suggest to you the discussion I'm about to have with you will tell you a lot about what this case is actually about.

Now, the United States Constitution that you saw kind of at the beginning of this case says the patent system is to promote science. And we're going to look at it here in a few moments, but it's to promote science. That's what the patent system is for. How we got to this week and late October is not about that.

03:56:10

These so-called fundamental patents that Mr. Sheasby talked about a few moments ago that Pictiva wants to talk about today, they belong to OSRAM, it never used them, never used them in its display business, as Dr. Quinlan told you.

In fact, this successful lighting company -- and OSRAM continues to be successful today. It has never used those patents in any of its lighting business. You never heard any evidence about that.

03:56:51

By 19 -- sorry, by 2018, OSRAM wanted to unload 1,400 patents of its OLED patents -- 1,400 of them. It hired a broker that reached out to, what, 400 companies -- 400 companies and said please buy these patents from us.

We do not want them anymore. We do not use them, and we never have used them.

And here's where things start to turn a bit -- away from the promotion of the progress of science which is what the patent system is supposed to be about. Two fellows, Paul Seaman and Paul Riley, you heard their names, and the closest that you ever really got to knowing anything abut them is if you look in your juror notebook later, you're going to see their two pictures in there.

03:57:48 They're in there.

But they set up this business called Jaspar. And you've seen the evidence. You saw Jaspar on some of the -- on some of the evidence there. And they looked at this business opportunity.

In 2019, they analyzed this opportunity, and they began to put together a business development plan. This was in 2019.

And they discussed the current state of affairs. They said OSRAM is willing to sell their patents to almost

03:58:19 anybody -- anybody. What does OSRAM want? Well, they expect eight figures. They're willing to take in the mid-$20 million range. Not for five patents that we're talking about here in this case, but for 1,400 patents which include these five patents.

By 2020, Mr. Seaman and Mr. Riley say, well, maybe

we will buy these patents ourselves, and we'll start reaching out to investors.

Now, let me make something very clear to you. There is absolutely nothing wrong about buying somebody else's intellectual property, about buying somebody else's patents. But the conduct that happened here tells you a lot about the credibility of the parties which Judge Gilstrap said you have to judge.

So they put together this business plan, and they

03:59:18

told these folks, they said we can get these patents for under $9 million, plus giving OSRAM a share going forward. And here's how we can make some money.

Not use the patents -- not use them. Not use them in making products, not competing in the marketplace, but we can make money through this licensing program that we're going to set up. They said we've already analyzed it, and here's what we're going to do.

Under this umbrella of KPI, they set up this next company called Pictiva. Same people. Mr. Riley,

03:59:58

Mr. Seaman were Jaspar, and then they set up -- then they were KPI, then they were Pictiva, along with Dr. Quinlan.

And they analyzed it, and they said, you know what we can do? We can get $65 million from Samsung, we can get $35 million from LG, and we can pick up $15 million from somebody else. And that's how we're going to make money on

this deal. It will give us a 201 percent rate of return on our investment.

And I ask you, is that promoting the progress of science? And Mr. Sheasby, a minute ago, said, well, Judge Gilstrap said this doesn't apply to the issue of damages. And I completely agree it doesn't. I completely agree with him it doesn't. What it applies to is the credibility of the parties in this case.

And let me show you why. Let's continue the

04:01:00 story. Pictiva started licensing discussions with Samsung and with LG, didn't they? LG dropped to its knee, and what did they do? They said, well, we'll settle with you. Samsung's closest competitor, LG, paid just about what Pictiva had projected, almost the same number. You saw that, and you have the LG license in front of you or with you. You'll have it if you ask for it.

With Samsung it was another story, though. Mr. Seaman and Mr. Riley and Dr. Quinlan thought, you know what, you're making us work too hard here. You're making

04:01:43 us work too hard. We're going to set these claim charts out and send these letters out and everything, and we're going to make a new demand on you, Samsung. We're going to demand $360 million. We're going to move from $65 million to $360 million.

And what did Samsung say? Samsung said, look,

we're a pioneer in this field. We have our own patents. You want to sue us, come on and sue us. And that's what seven people in the jury box in Marshall, Texas are here for. And that's why we're here because that's why the dispute happened.

So they filed their lawsuit, and they hired Mr. Kennedy who is the one sitting right over here at the edge. You remember Mr. Kennedy. And what Mr. Kennedy said is, you know what we can do, we can take that $65 million 04:02:38 deal or we don't have to take the $65 million deal. We don't have to take the $360 million deal for 1,400 patents, but we'll turn it into a $668 million deal. How about that, Samsung? Will that get your attention? Will that get your attention?

And how did Mr. Kennedy propose that he do that? He used a survey that was created only for this litigation, all the surveys that we went through with you, and Mr. Lavoie said that Samsung does -- not those. He used a litigation-created survey. And when the numbers didn't add 04:03:34 up like he wanted, what did he say? He said, well, I'm going to use a math technique called linear interpolation and extrapolation, whatever the heck that means, to make these numbers add up right.

What's the next thing that he did? He agreed that you have to apportion the damages.

Now, what apportion means is this. It means that you have to exclude from your damages other things that contribute to the value of the accused products beside the patents.

THE COURT: Two minutes remaining.

MR. GILLAM: Pardon me, Your Honor?

THE COURT: Two minutes remaining.

MR. GILLAM: Thank you, Your Honor.

He didn't even bother to read the reports of the man that had actually looked at the patents.

04:04:13

Then the hypothetical negotiation, he admitted to you that at a hypothetical negotiation, it's not only going to be, what, the numbers that Pictiva might want, but that Samsung would be willing to pay. He wants you to believe that Samsung would look across a table at these folks and say we would willingly pay you $668 million.

If you answer the first question about infringement no, the first questions about infringement no like we believe you will, like you should as the evidence has showed, then you don't have to answer the rest of these questions, and you can go on about your Friday evening. You don't even reach this question of damages.

04:04:48

Samsung respects the patent system. Probably has more patents than anybody. If it needs to use somebody else's technology, it does so by taking a license. You

heard about the orthogonal license that Samsung took. Here it uses its own technologies.

This case was about more than infringement. If for some reason you disagree, then as Dr. Perryman outlined, the actual number should be about $1.7 million and you can spread it across all five patents.

But let me end with this question for you. Was endorsing a business plan set up to make a 201 percent rate of return for -- as Ms. Truelove described them, an

04:05:46

intellectual property monetization company based in Dublin, Ireland, what the framers of our Constitution had in mind when 238 years ago they put together our Constitution under Article I, Section 8, to promote the progress of science and useful arts, by securing for a limited time to authors and inventors the exclusive right to their respective writings and discoveries?

THE COURT: Time has expired, counsel. Take a few seconds and finish up.

MR. GILLAM: It is not. And I don't believe you

04:06:26

think it is either.

On behalf of the folks that I tried this case with, thank you. More importantly, on behalf of the men and women that work at Samsung, we appreciate the time. I appreciate you listening to me. And we look forward to getting your verdict. Thank you.

MR. SHEASBY: Your Honor, may we approach?

THE COURT: Approach the bench.

(Bench conference.)

MR. SHEASBY: Violation of motions in limine, reference to us being in Dublin, Ireland. Clearly not allowed to talk about the national origin of any company.

Mr. -- the other statement was that the accused products are manufactured in the A1 factory. There is not a shred of factual evidence in the record to support that.

04:07:12 That was a false statement that had no basis in the case record, and we want a curative instruction on it.

The third thing is Mr. Gillam indicated a failure to call Mr. Seaman and Mr. Riley based on the fact that their pictures were in the notebook. That's also a violation of a motion in limine.

MR. GILLAM: May I respond to the ones regarding me?

First of all, I never said they didn't call them. I said if you want to know anything about them, you can see

04:07:38 their pictures in the notebook. That's all I said about that.

As far as the facility being -- or the monetization company in Dublin, Ireland, that was said during opening statement.

THE COURT: All right. Do you have anything else,

Mr. Sheasby?

MR. SHEASBY: Yeah. The falsehood about these products being manufactured in A1.

MR. PAK: Your Honor, what I said is the A1 factory still -- was in operation until 2017. They're accusing all products going back to 2013. It must include the 2013. They have not conducted discovery into the A1 line for strategic purposes. It does not mean that the products were not manufactured --

04:08:05 THE REPORTER: Judge?

THE COURT: Speak up.

MR. PAK: It does not -- just because they decided strategically not to -- not to conduct discovery into the A1 manufacturing line, which was in operation, as we heard, until 2017, does not mean that the products that are being accused going back to 2013 are not produced there.

THE COURT: All right.

MR. SHEASBY: There are no facts -- that was just an admission. There's no facts in the record for that statement either, Your Honor.

04:08:44

THE COURT: All right. Counsel, these objections are overruled.

Let's complete your closing argument.

MR. SHEASBY: Thank you, Your Honor.

(Bench conference concluded.)

THE COURT: Mr. Sheasby, you have 16 minutes and 45 seconds of closing argument time left. Would you like any additional warning?

MR. SHEASBY: I would indeed, Your Honor. If I could get additional warning times at 10 minutes and at -- 10 minutes used and at 2 minutes left.

And may I approach the counsel table?

THE COURT: At 10 minutes used and 2 minutes left?

MR. SHEASBY: Yes. Effectively at 10 minutes and 14 minutes, Your Honor.

04:09:15

THE COURT: I'll give you those warnings. You may proceed with Plaintiffs' final closing argument.

MR. SHEASBY: I'm in your debt.

I want to start -- can I have the ELMO actually?

Apparently, counsel for Defendants believes that what they tell you is more important than what a United States Federal Court tells you.

On the issue of invalidity, it is their sole burden of proof -- sole burden of proof. We don't have to bring any evidence because of the utter failure by their witnesses who admitted under oath that Clix2 is different from the current design.

04:10:06

Someone asked you was what those two attorneys paid by Samsung said truthful. You turn to Page 22 of the Court's instructions, and you read the truth. It is their

sole burden, and this suggestion that because this unsupported suggestion that Clix2, which is utterly different from the current design invalidates our patents, those are arguments that are forbidden for you to consider.

Page 23 of the jury instructions. And I would request that you write these page numbers down, respectfully.

The burden of proof of obviousness is the sole burden of the individuals sitting at this table, and they
04:11:16
utterly failed in that burden. And I'll give you some evidence of that.

Let's go to Slide 151.

This is the '389 patent, and they spoke about -- let's go to Slide 152.

They spoke about some patents that they bought from third-party sources, Jones and Burrows, none of which used the claimed inkjet system. And they didn't tell you that. They had 40 minutes to tell you the truth, and they didn't.

04:11:56
Of course, these patents don't invalidate. Of course, they didn't carry their burden of proof. Their witness admitted it under oath. He also admitted that this random combination of Burrows, Jones, and Yamazaki that their prose renders our patents obvious has never been created in the entire world.

The people who have the burden by clear and convincing evidence are sitting in this courtroom. They're sitting in the back row right now. And the reason why they didn't ask to -- weren't asked to stand in this case, the reason why they weren't acknowledged is because they admitted under oath that these patents are not invalid.

Let's go to the '547 patent, Slide 167.

The '547 patent, Dr. Katona, who has never built a commercial OLED in his entire life, said: Oh, you just combine Igarashi and Kido.

04:13:08

And we asked him: Had that ever been done? Had anyone in the world ever done what you're proposing?

And he admitted under oath, clear and convincing evidence of invalidity, and an utter failure of a witness after witness after witness that they paid to tell you that up is down and black is white.

Let's go to Slide 168.

This is the '164 patent. The '164 patent talks about the three matrix materials. Clear and convincing evidence, invalidity? Their own employee said it doesn't have three matrix materials. He admitted it under oath.

04:13:51

The suggestion that our witnesses didn't respond on these issues is -- and this is a harsh term, and I use it with reticence -- it is a falsehood. And I regret having to say that language in a United States Federal

Court.

Dr. Humphrey analyzed the Clix design, and he said, it was a failure, and no one ever used it as a replacement for the '164 patent.

Just as -- if we go to Slide 157.

Dr. Schanze spoke about the fact that the Clix2 manufacturing process was nothing like the current design. What was said to you, what was told to you by these paid attorneys was a falsehood, pure and simple. Clear and convincing evidence.

04:15:10

In fact, the behavior of the part of Samsung in presenting this invalidity defense -- let's go to Slide 168 again -- was so shocking -- was so shocking that they didn't even engage the validity argument of the '164 patent.

And what did I mean by that? I mean that Dr. Kymissis tried to show you values for HOMO and LUMO levels for the Clix2 design, and he showed you this document, and he pointed to these as the three matrix materials in the HOMO and LUMO values. And then he pointed to you these documents, and he said to you those show the HOMO and LUMO values.

04:15:53

Do you remember we had a long colloquy yesterday in the afternoon, and you good people must be thinking, Mr. Sheasby, just sit down. Let's get this over with. And

I kept saying, these documents are from 2025. These documents are from 2020. They have no connection to what was done in 2007. And I was the only person who told you -- when this slide was shown by Dr. Kymissis, he hid from you the most critical and devastating piece of evidence in this case. He hid from you that what he was saying was one of the prior art designs, the LHT-101 (sic), was something created by LUDIS Korea.

And his evidence for what the HOMO and LUMO levels were for that was a document from 2025 made by a different company. That's what he tried to pull on you in this jury this week.

04:16:52

I would submit to you that saying words like "we respect the patent system," "we're an innovator," the behavior that occurred this week is the exact opposite of that. And it wasn't once, it was again.

He pointed to something called the GGH01 material decided by Gracel Korea -- and let me be clear, I think Korea probably makes wonderful chemical dopants, but I know one thing for sure, what he showed you was a 2025 document from a different manufacturer. And if I wouldn't have objected and if I wouldn't have raised my voice, he would have gotten away with that.

04:17:32

On the issue of improper inventorship of the '424 (sic), if they think the wrong inventors are named on the

patent, call a single one of those inventors and ask them if they think they were inappropriately excluded or inappropriately included on the patent. That is their burden by clear and convincing evidence. And they didn't.

There's a line from the Old Testament, and I know that it's sometimes controversial to talk about religion in public places, but I'm going to do it. You will know me by my deeds. You will know me by my deeds. And the deeds in this case were the presentation of evidence that is on its

04:18:46 face false and testimony by their own witnesses admitting that these claims are not invalid.

There was another distraction that was presented -- let's go to Slide 195.

There's a marking obligation in this case. And what that means is that if we practiced our patents, we are only allowed to seek damages from the period of time that we provide notice to Samsung of infringement.

Now, what these counsel said to you that we're seeking damages from before the period of time we provided

04:19:40 notice -- once, again, I'm going to use a very harsh term -- that was a falsehood. We are seeking damages from 8/17/2021 for the '223 and '164 patent. And what that date corresponds to -- if we go to Slide 10 -- is the first set of damages we're speaking to is the date we sent them formal notice.

And the reason why we did that is because LG and OSRAM did practice the patents.

THE COURT: 10 minutes have been used.

MR. SHEASBY: And so if you go back to Slide 195, we were very conservative and only sought damages after notice in compliance with the law.

What was said to you was a falsehood.

Let's go to Slide 210.

This is the LG agreement that they hang their hat on. At the time it was being sold, LG was losing $5.8 billion.

04:20:54

This is the amount that was calculated for LG, which was six times smaller than Samsung. You see that's $198 million?

You see that at the same time LG was losing billions of dollars -- and Ms. Quinlan, who I'd like to stand again, she may be from Dublin, Ireland. There was some suggestion there was something improper about that. I can tell you if -- I think if we have more business executives from Dublin, Ireland, and less from Samsung, we'd be in a better place in this world because she told the truth.

04:21:34

You may sit down.

LG could not have fared to pay more than it paid because it was losing billions of dollars, and it wasn't

using the '547 patent.

In contrast, the value to Samsung, given their immense revenues -- and you can look at PX-07 if you want to see those immense revenues. You can actually see that about how much money they were making from infringing these patents. And we calculated a very reasonable royalty of $391 million.

But then something happened. In March of 2022, they started launching their infringing QD-OLED products, and in November of 2023, they launched the '425 patent.

04:22:26

Let's go to 2002 -- 202, please?

I'd like Mr. Kennedy to stand.

Mr. Kennedy has negotiated over 200 license agreements, and effectively what counsel for Samsung said was effectively he's a liar and he's incompetent.

Now, these are actually colleagues that I respect as lawyers, but what they said was beyond the pale. The reality is the following. They spent 15 minutes -- 12 minutes of their closing talking about agreements between OSRAM and Pictiva that are utterly irrelevant to damages, utterly irrelevant to damages.

04:23:14

Why would they do that? Why would they waste 12 minutes of your time talking about utterly irrelevant numbers? And I'll tell you why those numbers are so irrelevant, because the numbers were upfront payments to

pay back the cost of obtaining the patents. The true value to OSRAM was 50 percent of all revenue that was going to be obtained.

You will know me by my deeds. And counsel may be very nice men, but their deeds in this case do not reflect well on Samsung. And it's not their fault. The employees of Samsung, the attorneys of Samsung, they have to march to the instructions of Samsung. Someone -- we don't know who --

04:24:14 THE COURT: Two minutes remaining.

MR. SHEASBY: I'm sorry?

THE COURT: Two minutes remaining.

MR. SHEASBY: Someone -- some executive at Samsung, we do not know who, told them to advance false arguments, told them to use documents that have no connection to what was actually going on in 2007. We'll never know who they was -- that was. They're just doing their job, and I understand that and respect that.

But the law must be followed and the obligations to strictly comply with the Court's rules must be followed. 04:24:40

Let's go to Slide 196 -- 196.

The idea that we're greedy, that we're taking more than our share is the exact opposite. They're left with $2.7.96 (sic) billion from their use of these infringing patents. That is in my mind an extraordinary deal for a

company that has systemically violated the laws of the United States.

I want to end with this. This is about the worst time I can possibly think of for a case to go to the jury. It's Halloween. And as Ms. Truelove reminded me, it is Friday night football, and Marshall is playing Hallsville. 20-minute drive I've been told. And the idea that you're getting this case this late in the day and suggestions from Plaintiff -- Defendant, just go quickly, just mark no and

04:25:44

move on. I'm going to respectfully ask you -- I'm going to respectfully beg you to give this case and the gravity and time that has been invested in it what it deserves. You have sacrificed so much for this week. Please, please, do not rush this process. Please give OSRAM, please give Dr. Quinlan the right to have the evidence heard.

THE COURT: Time has expired, counsel. Take a few seconds and finish up.

MR. SHEASBY: And carefully consider it. I'm so grateful for your attention. I am so grateful.

04:26:30

Thank you.

THE COURT: All right. Ladies and gentlemen, I need to give you a few final instructions before you begin your deliberations. You must perform your duty as jurors without bias or prejudice as to any party.

The law does not permit you to be controlled by

sympathy, prejudice, or public opinion.

All parties expect that you will carefully and impartially consider all the evidence.

Follow the law as the Court has given it to you and reach a just verdict regardless of the consequences. Answer each question in the verdict form based on the facts as you find them, following the instructions the Court has given you about the law.

Do not decide -- and I've said this before, I will
04:27:19
say it again -- do not decide who you think should win this case and then answer the questions to reach that result.

And, again, let me remind you, your answers to the questions in the verdict form and your verdict as a whole must be unanimous. You should consider and decide this case as a dispute between persons of equal standing in the community, of equal worth, and holding the same or similar stations in life. This is true in patent cases between corporations, partnerships, other business organizations and individuals.

04:27:52
A patent owner is entitled to protect its rights under the laws of the United States, and this includes bringing a suit in a United States District Court for money damages when it believes its rights have been infringed.

This also includes the rights of a Defendant to vigorously defend against those allegations and to assert

that the patents are invalid.

The law recognizes no distinction between types of parties, and all partnerships, corporations, other business organizations, and individuals stand equal before the law regardless of their size, regardless of who owns them, and they are to be treated as equals.

Now, when you retire to the jury room to deliberate on your verdict, as I've told you, I'm going to send you your own individual copies of these final jury instructions that I have given you. If during your deliberations you desire to review any of the exhibits which the Court has admitted into evidence and which have been shown to you over the course of the trial, you should advise me by a written note signed by your foreperson and delivered to the Court Security Officer, and I will then send that exhibit or those exhibits to you.

Once you retire, you should select your foreperson and conduct your deliberations. If you recess during your deliberations, follow all the instructions the Court has given you about your conduct during the trial.

After you've reached a verdict, your foreperson is to fill in the verdict form reflecting your unanimous answers to the questions. And you are not to reveal your answers until such time as you're discharged unless otherwise directed by me. And you must never, ladies and

gentlemen, disclose to anyone, not even to me, your numerical division on any unanswered question.

Any notes that you've taken over the course of the trial, I remind you, they are aids to your memory only. If your memory should differ from your notes, rely on your memory and not your notes. The notes are not evidence, and a juror who has not taken notes or who has taken very few notes still must rely on their independent recollection of the evidence and should not be unduly influenced by the notes of other jurors. Notes are not entitled to any greater weight than the recollection or impression of each juror about the testimony.

Now, if you want to communicate with me at any time during your deliberations, you should give a written message or a question signed by your foreperson to the Court Security Officer who will bring it to me, and I will then respond as promptly as possible either in writing or by having you brought back into the courtroom where I can address you orally. And I will always first disclose to the attorneys in the case your question and my intended answer before I respond to any question you might send me.

After you've reached a verdict and after I have accepted your verdict and discharged you as jurors, at that point, ladies and gentlemen, you are not required to talk to anybody about your service as a juror in this case.

But by the same token, at that point, you will be completely free to talk to anyone of your choosing about your service as a juror in this case. At that point, it will be 100 percent up to you and no one else.

I'm now going to hand seven copies of these final jury instructions and one copy of the verdict form to the Court Security Officer to deliver to you in the jury room.

Ladies and gentlemen of the jury, you may now retire to the jury room to deliberate on your verdict. We await your decision.

04:31:44

COURT SECURITY OFFICER: All rise.

(Jury out.)

THE COURT: Counsel, you are welcome to wait here in the courtroom or to leave an individual here for that purpose. If you wait off premises, please don't go far so that you can get here quickly if the Court receives a note or if the jury returns a verdict.

Awaiting either a note from the jury or the return of their verdict, we stand in recess.

04:32:29

COURT SECURITY OFFICER: All rise.

(Court adjourned at 4:32 p.m.)

CERTIFICATION

I HEREBY CERTIFY that the foregoing is a true and correct transcript from the stenographic notes of the proceedings in the above-entitled matter to the best of my ability.

/S/ Shelly Holmes 10/31/2025
SHELLY HOLMES, CSR, TCRR Date
CERTIFIED SHORTHAND REPORTER
State of Texas No.: 7804
Expiration Date: 10/31/2027